IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, a nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama,<br><br>Defendant. | Civil Action No. 2:24-cv-104-RAH-JTA<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION** |

## INTRODUCTION

Governor Ivey admits that the requirement that two of the nine members of the Alabama Real Estate Appraisers Board (Board) be racial minorities is unconstitutional.[1] But she wants to avoid the consequences of that concession by preserving her power to appoint individuals to the Board on the basis of race—something she did just weeks ago. To that end, she argues that Plaintiff American Alliance for Equal Rights (Alliance) lacks standing to seek an injunction on behalf of its members because she already complied with the quota by hurriedly nominating minority candidates to fill three seats on the Board. Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order/Preliminary Injunction (Opposition), Dkt. No. 20, at 1–2. This Court should reject the Governor's roundabout attempt to preserve her power to engage in unconstitutional racial discrimination.

---

[1] Pursuant to the Court's March 15 Order, counsel for the parties met and conferred about the issues in the case on March 15 at approximately 3:35 p.m. CDT. The parties were able to agree that the requirement of Ala. Code § 34-27A-4 that "no less than two of the nine board members shall be of a minority race" is unconstitutional. The parties were unable to agree on any other issues in the case.

Despite the Governor's attempt to muddy the waters, the facts are clear. One of Plaintiff's members, Member A, is a citizen of Alabama, who is qualified and has applied to the public seat on the Board. *See* Complaint, Dkt. No. 1, ¶¶ 22–23; Declaration of Member A ¶ 4. Plaintiff challenged the quota immediately after Member A applied for the Board's one—and only—open slot. At the time she applied, only one racial minority was currently serving on the Board, meaning that Ala. Code § 34-27A-4 dictated that a minority be appointed to the only open position. Opposition at 5–6. Because Member A is not a racial minority, she was categorically precluded from being nominated to this position.

Eight days after the Alliance sued, the Governor appointed five seats on the Board, including two racial minorities. She now claims that Member A suffers no injury because when she a week later nominated the remaining four seats—including a racial minority to the seat Member A had applied for—she no longer had to consider race because two racial minorities were already appointed the week prior. In any other circumstance, such gamesmanship would be recognized as a clear attempt to moot Member A's meritorious equal protection claim. Yet even if Member A's claim was technically moot, the ease by which the Governor mooted it is precisely why courts still consider claims that are "capable of repetition, yet evading review." *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014).

The Governor stakes so much on standing and mootness because of the weakness of her arguments on the TRO factors. She has conceded that the racial quota the Alliance challenges is unconstitutional, and thus that the Alliance is virtually certain to succeed on the merits. The Governor's argument that Member A suffers no irreparable harm is largely indistinguishable from her standing argument, and in any event fails because injunctive relief here is the only way to preserve Member A's right to an equal playing field regardless of race. *See Ne. Fla. Chapter of*

2

*Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). And "[i]f the statute in fact violates the Constitution," as the Governor admits it does, "the Government does not have a legitimate interest in its implementation." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1293 (M.D. Fla. 2021). Instead, the public interest favors a temporary injunction that would allow the Alliance's claims to be tried on the merits.

### *Timeline of Events Leading to Plaintiff's Motion*

The Governor attempts to paint an unremarkable picture of the chain of events leading to Plaintiff's application for a TRO and preliminary injunction. But the evidence she submits only casts more doubt on the Governor's actions and underscores the need for preliminary relief.

For the ensuing discussion, it is helpful to provide a timeline of events leading to Plaintiff's application for a TRO and preliminary injunction. As indicated, most facts below are lifted from the Governor's opposition to the instant motion.

- Since at least 2021, the public member slot for appointment to the Alabama Real Estate Appraisers Board has been vacant. Opposition at 5.

- As of late May 2023, all members of the Board had exceeded their original appointments and were continuing to serve under the holdover provision in Ala. Code § 34-27A-4. Opposition at 5.

- On June 1, 2023, Governor Ivey submitted nine names to the legislature for nomination to the Board. Exactly two of the individuals nominated satisfied the racial quota. ***All nominations*** were submitted at the ***same time***. Opposition at 5–6.

- Among the individuals nominated was Tim Mills, who was nominated to the public member slot. Mr. Mills was one of the appointments that would have satisfied the racial quota. Opposition at 6.

3

- The legislature declined to act on any of the Governor's nominations to the Board. Opposition at 6.

- The Board continued to meet and conduct business in the ensuing months, and it continues to meet and conduct business. *See* TRO, Exh. C.

- From at least July 2023 until this lawsuit was filed, the Governor made well over a hundred appointments to various Alabama boards and commissions. Many of those appointments needed—and still need—legislative approval.[2]

- The Governor made no appointments to the Real Estate Appraisers Board during this time. Opposition at 5–6.

- Plaintiff filed the complaint in this case on February 13, 2024. Dkt. No. 1.

- At the time Plaintiff filed its complaint, there was only one vacancy on the Board—the public member slot. Opposition at 5. There was also only one racial minority on the Board. *Id.* at 5–6.

- Eight days after the complaint was filed, the Governor appointed ***only five*** members of the Board. Two of those members satisfied the racial quota in Ala. Code § 34-27A-4. Opposition at 6.

---

[2] Since the last legislative session ended on June 6, 2023, the Governor has made hundreds of appointments over an eight month span. *See generally*, Alabama Political Reporter, Appointments, *available at* https://www.alreporter.com/?s=appointments. For example, on July 31, 2023, the Governor nominated Bobby Humphrey to the Alabama Surface Mining Commission. *See id.* at https://www.alreporter.com/2023/08/01/gov-kay-ivey-appointments-committees-july-2023/.
Mr. Humphrey's July nomination is currently pending in the legislature. *See* The Alabama Legislature, *Confirmations*, *available at* https://alison.legislature.state.al.us/confirmations?tab=0. The same is true of appointments made in August through February.

- One of those members that satisfied the racial quota, Randall Kyles, had been previously nominated in June. The other member, Andreas Smith, had never been nominated before. Opposition at 6.

- A week after these initial appointments, the Governor made ***four additional*** appointments to the Board. Among those nominations was Mr. Mills, who had previously been nominated in June. Opposition at 6.

- Plaintiff's counsel was made aware of the Governor's nominations on March 7, 2024. TRO at 2 n.2; *see also* TRO, Exh. B (email from Governor's counsel to Plaintiff's counsel).

- Plaintiff filed the motion for TRO and preliminary injunction four days later on March 11, 2024. Dkt. No. 11.

## ARGUMENT

It strains credulity to think this chain of events is not an overt attempt to divest this Court of jurisdiction to hear a valid constitutional claim.[3] Plaintiff plainly had Article III standing when the complaint was filed. The Governor now argues that actions she unilaterally undertook weeks after the complaint was filed divest this Court of jurisdiction. If this gamesmanship is allowed to go forward, the Governor can make race-based appointments with impunity. As soon as a challenge

---

[3] Notably absent from any of the Governor's submissions are: (1) Any statement denying that the chain of events was in response to the lawsuit; (2) Any reason for the months-long delay in renominating the seven members she had nominated in June; (3) Any statement explaining why she nominated the members of the Board in two separate batches one-week apart; (4) Any reason for not including the minority public member, Mr. Mills, in the first batch of nominees when she had already nominated him previously; (5) Any statement that she was unaware of the lawsuit—which was widely reported in Alabama papers—when she made her appointments. *See, e.g.*, Nate Raymond, *Affirmative action foe sues over Alabama real estate board's minority-only seats*, Reuters (February 14, 2024), *available at* https://www.reuters.com/legal/government/affirmative-action-foe-sues-over-alabama-real-estate-boards-minority-only-seats-2024-02-14/.

is made, she can simply change her nominations and argue the claim is moot or that there is no injury. The Court cannot countenance the Governor of Alabama continuing to discriminate against its citizens pursuant to a statute everyone agrees is unconstitutional. For the reasons that follow, the Court should grant Plaintiff's motion for a TRO and/or a preliminary injunction.

## I.    Plaintiff's TRO and Preliminary Injunction Seek Only to Preserve the Status Quo

The Governor is confused about the difference between the ultimate relief sought in a complaint and the equitable powers of a federal court to preserve the status quo in order that a plaintiff may obtain the relief sought in the complaint. *See* Opposition at 7 n.4 (lamenting that the Alliance "seeks wholly different relief" from that which it sought in the complaint); *id.* at 8–9 (arguing that Plaintiff "lacks standing" as to the eight non-public members). It is true that this Court needs to assure itself of jurisdiction over Plaintiff's pleaded claim. However, it is not true that this Court's equitable powers are limited to preserving the status quo only via the relief sought in the complaint. After all, it is not Plaintiff's fault that enjoining the eight non-public members may be necessary; it was the Governor's unilateral actions that forced the Court's hand.

A TRO typically "functions to preserve the status quo until a court can enter a decision on a preliminary injunction application." *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 n.5 (11th Cir. 1999). Its purpose is not to grant relief on the merits, but simply to "protect against irreparable harm and ... preserve the status quo until a decision on the merits can be made." *Grasso v. Dudek*, No: 6:13-cv-1536-Orl-28GJK, 2014 WL 12621193, at *2 (M.D. Fla. Jan. 6, 2014). To accomplish this, courts sometimes issue restraining orders or injunctions that are designed not to remedy the plaintiff's particular injury, but rather to "maintain the status quo and provide [the] Plaintiff the opportunity to obtain any relief at all." *Wynn*, 545 F. Supp. 3d at 1295. In *Wynn*, a nationwide

injunction was appropriate to preserve the status quo, even though the Florida farmer—to use the Governor's language—"lacked standing" over farm loans in Hawaii.[4]

This power to preserve the status quo is consistent with the Supreme Court's general instruction that the power to grant equitable relief is broad and flexible. *See Brown v. Plata*, 563 U.S. 493, 538 (2011) ("Once invoked, the scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies." (cleaned up)); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944))).

Here, even though Member A would lack standing to challenge nominations to the seats she is not qualified to obtain, a temporary order requiring the Governor to withdraw those nominations may be the only practical way to preserve the Alliance's possibility of ever obtaining the relief it seeks in its complaint. If the Governor were permitted to fill the remaining eight seats with candidates nominated only after the Alliance brought its lawsuit, she could deprive this Court

---

[4] Indeed, this situation is very analogous to the narrow scenarios where courts find it appropriate to issue preliminary injunctions of *nationwide* scope. For example, in *Wynn*, the Middle District of Florida considered a farmer's request to preliminarily enjoin enforcement of a federal statute forgiving certain farm loans for non-white farmers. Although the court expressed substantial skepticism of nationwide injunctions, it ultimately concluded that "the only way to avoid Plaintiff's irreparable harm is to enjoin the program." *Wynn*, 545 F. Supp. 3d at 1295; *see also Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (granting a nationwide TRO against the same program "[t]o ensure that Plaintiffs receive complete relief and that similarly-situated nonparties are protected" (citing *City of Chicago v. Barr*, 961 F.3d 822, 916–17 (7th Cir. 2020)). In the same way, an injunction pausing the nomination process and requiring the withdrawal of at least the four nominees put forth for the first time after this lawsuit was filed is the only way to preserve the possibility of complete relief for Member A.

of the opportunity to hear the case at all, and Member A would never have her application considered on equal terms with applicants of all races.

## II.    Plaintiff Has Article III Standing for the Lone Claim Pleaded in Its Complaint

### A.    The Alliance Has Associational Standing

Organizations like the Alliance may "assert the standing of their members" under Article III of the Constitution. To bring suit on behalf of its members, the Alliance must show that (1) one or more of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) the individual members' participation is not required. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021).

The Governor does not challenge that the Alliance satisfies the second and third prongs of this test. Instead, the Governor claims the Alliance fails the first associational standing requirement because Member A is not injured. The Governor essentially argues that there is no injury from the racial quota because she followed it already. Since she appointed two minority members eight days after the Alliance filed this lawsuit, Member A cannot complain because, when the public member slot came up a week later, the quota had been filled.

Even if these efforts to moot the case were above board, the Governor gets the injury wrong. The injury in an equal protection case "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). The Governor *admits* that the quota is a discriminatory barrier to a government office.

The Supreme Court has explained that individuals like Member A "do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory qualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970). Here, the Alliance alleges that Member A faces a racial barrier in her appointment to the Board. Dkt. No. 1 ¶¶ 24–33; Decl. of Edward Blum, Dkt. No. 11-5 ¶ 4. The Alliance's allegations are plainly cognizable under Article III, and the Governor may not "deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner*, 396 U.S. at 362–63.

Despite this straightforward posture, the Governor claims that the Alliance "cannot show a 'real and immediate' threat of future injury or 'continuing, present adverse effects'" because the next opening for a public Board member won't be for at least two years, when Mr. Mills' term comes to an end. Opposition at 11. Even if the next round of discriminatory Board decisions won't happen until 2026—which is far from certain[5]—that is sufficiently imminent to support standing as a matter of law because "[i]mmediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (citing *Adarand constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995)).

The discriminatory law is currently in place and there is no indication that the Governor will choose not to follow it next time—after all, she just followed it even while admitting its unconstitutionality. Whether that occurs in June 2024 because the Senate again fails to confirm the

---

[5] Perhaps Mr. Mills will be elected to statewide office like his predecessor, thus leaving the public member seat vacant again. *See* Opposition at 5. The point is that there is no clear timing of appointments to boards and commissions in Alabama as this case more than aptly demonstrates.

Governor's appointees, or whether it is in March 2026 when the current terms expire, there is little question that Alliance members will again have their equal protection rights violated within some fixed period of time. "[P]robabilistic harm" is sufficient to show Article III injury-in-fact, and the Alliance has more than met this requirement. *Id*. at 1163.

**B.      Plaintiff's Members' Anonymity Is No Bar to Standing in the Eleventh Circuit**

The Governor argues that an anonymous declaration of a member is insufficient to support standing on a preliminary injunction. *See* Opposition at 12 n.6. In support of this argument, the Governor cites a dissenting opinion in the Eleventh Circuit, and a recent decision by the Second Circuit. *Id.* (citing *Do No Harm v. Pfizer, Inc.*, No. 23-15, 2024 WL 949506 (2d Cir. Mar. 6, 2024); *AAER v. Fearless Fund Mgmt.*, No. 23-13138, 2023 WL 6520763, at *2 n.1 (11th Cir. Sept. 30, 2023) (Wilson, J., dissenting from order granting injunction pending appeal)). Given the abundance of caselaw holding the exact contrary position—including binding precedent in the Eleventh Circuit she fails to cite—the Governor's argument is borderline frivolous.

Starting with that binding precedent, the Eleventh Circuit has repeatedly held that, "for prospective equitable relief, organizational plaintiffs 'need not "name names" to establish standing.'" *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235, 240 n.8 (11th Cir. 2020) (quoting *Ga. Republican Party v. S.E.C.*, 888 F.3d 1198, 1204 (11th Cir. 2018)). And the dissenting opinion in *Fearless Fund* comes from the panel opinion noting that the plaintiff "'clearly' has standing." 2023 WL 6520763, at *1.

As for the Second Circuit decision, it is an extreme outlier. A month earlier, the Tenth Circuit came out the other way, explaining that "[l]ongstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024). But the Tenth and Eleventh Circuits are not alone:

- "[W]e do not know the names of the individuals … but anonymity is no barrier to standing." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022).

- "[W]e see no purpose to be served by requiring an organization to identify by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

- "We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint[.]" *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012).

- Article III "allows for the member on whose behalf the suit is filed to remain unnamed by the organization." *Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008).

Put simply, Member A's anonymity is no bar to the Alliance's standing in the Eleventh Circuit.

### C.    Plaintiff's Claim Is Capable of Repetition, Yet Evading Review

The Governor's actions in the two weeks after this lawsuit was filed reveal her belief that she can shield herself from future challenges to the statute's constitutionality simply by fulfilling the Board's racial quota anytime a legal challenge is brought. All of the Governor's standing arguments stem from actions she took after this lawsuit was filed. But even if the Governor's actions mooted the Alliance's claims—which they do not—this Court still has jurisdiction to review the claims under the "capable of repetition, yet evading review" exception to the mootness doctrine.

A plaintiff whose claims have allegedly become moot may assert the capable of repetition, yet evading review exception when (1) the challenged action's duration is too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. *Arcia*, 772 F.3d at 1342; *Rush v. Roberts*, No. 3:21-cv-518, 2023 WL 3569967, at *2 (M.D. Ala. May 19, 2023). The exception requires a "reasonable expectation or a demonstrated probability that the same controversy will recur," *Health Freedom Def. Fund v. President of United States*, 71 F.4th 888, 894 (11th Cir. 2023) (quoting *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 463 (2007)), and the state bears a "heavy burden" in demonstrating that a plaintiff's expectation that the challenged actions will continue is unreasonable. *Bourgeois v. Peters*, 387 F.3d 1303, 1309 (11th Cir. 2004).

Here, the Governor spent seven months since the past legislative term appointing individuals to Alabama's various boards and commissions—but none to the Real Estate Appraisers Board, even though it was operating with eight holdover members and one vacancy. *See supra* n.2; Opposition at 5. The Alliance filed its lawsuit on February 13, 2024, and within 8 days the Governor appointed five members to the Board, two of whom satisfied the racial quota. Opposition at 6. One week later, the entire board had been filled. *Id*.

Put another way, it took the Governor only *fifteen days* to attempt to moot the Alliance's challenge to a law that the Governor admits is unconstitutional. This duration is unquestionably too short to allow a case to be fully litigated. In *Bourgeois*, the Eleventh Circuit held that a two-week period was "clearly insufficient to allow meaningful judicial review," then went on to conclude that even "one year is an insufficient amount of time for a district court, circuit court of appeals, and Supreme Court to adjudicate the typical case." 387 F.3d at 1308–09; *see also Arcia*, 772 F.3d at 1343 (three months to challenge removal from voter rolls is too short to be fully

litigated); *Florida Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1324 n.6 (11th Cir. 2001) ("[e]lection periods" too short to fully litigate the constitutionality of a statute before the election ends); *Sierra Club v. Martin*, 110 F.3d 1551, 1554 (11th Cir. 1997) (four month term of preliminary injunction too short to allow appellate review).

The Alliance also satisfies the second prong of the capable of repetition, yet evading review test because there is a "reasonable expectation" that its members will be subjected to Alabama's racially discriminatory law governing appointments every time a seat becomes vacant in the future. *Arcia*, 772 F.3d at 1343. This standard requires "more than a 'mere possibility' that the conduct at issue will recur, but far less than absolute certainty." *Bourgeois*, 387 F.3d at 1309.

In *Arcia*, voters and voter organizations sued Florida's Secretary of State, challenging a program that removed non-citizens from voting rolls within 90 days before an election. *Arcia*, 772 F.3d at 1339–40. Although the challenged election had passed by the time plaintiffs' appeal was heard by the Eleventh Circuit, the court nonetheless found a reasonable expectation that the plaintiffs would be subject to the program again, in part because the Secretary had not offered to refrain from similar programs within the 90-day window in the future. *Id.* at 1343; *see also Bourgeois*, 387 F.3d at 1310 (fact that circumstances surrounding city's decision to implement program continue to exist satisfied second prong).

Despite admitting the statute is unconstitutional, the Governor has not stated an intent to refrain from following it, nor has she instructed her attorney general to challenge the law or introduced legislation to repeal it. This law will still be in effect the next time the Governor makes an appointment to the Board, and her willingness to continue implementing it despite its acknowledged constitutional defects more than supports a reasonable expectation that Alliance members will be subject to the same racial discrimination again and again.

### III.    All the Racial Mandates in Ala. Code § 34-27A-4 Are Unconstitutional

While the Governor admits the defects in the racial quota in Ala. Code § 34-27A-4, *see supra* n.1, she believes the more general racial mandate in the statute is constitutional. She is wrong.

Section 34-27A-4 also violates the Constitution insofar as it requires that "[t]he overall membership of the board shall ... reflect the racial [and other] diversity of the state." *See Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1570 (11th Cir. 1994). Statutory language mandating that Board appointments must reflect state-level racial demographics, rather than an unbiased selection of qualified applicants, is plainly unconstitutional racial discrimination. *Id.* ("By striving for racial parity rather than an end to racial discrimination, these decrees actually promote racial discrimination in contravention of the Constitution.").

Even without imposing a strict racial quota, the goal-setting diversity language encourages the Governor to violate the Constitution. The Governor curiously cites *Ensley Branch* for the argument that a general racial mandate is just "hortative." Opposition at 13. But the Governor misses the point of that case. The *Ensley Branch* court **reversed** a district court that left general diversity language untouched. It was the district court that thought the more general language was "hortative." 31 F.3d at 1570. The Eleventh Circuit was unequivocal that "courts should not be satisfied with partly reducing the effects" of unconstitutional language. *Id.* It thus required the lower court to rewrite the general diversity goals found in the previously issued decree. *Id.*

The only possible effect of the more general discriminatory language in Section 34-27A-4 is to force the Governor to put a thumb on the scale in favor of racial discrimination in evaluating applicants. Thus, like the quota requirement itself, the language encourages unconstitutional racial discrimination and must be declared unconstitutional.

**IV.    The TRO/Preliminary Injunction Factors All Weigh Heavily in Favor of Granting Plaintiff's Injunction**

Each of the four TRO factors weighs heavily in favor of the Alliance. First, the Governor has conceded that the statute is unconstitutional—thus, any challenge on the merits would succeed.[6] Second, as discussed above, the Alliance will suffer irreparable harm if Member A is deprived of her fundamental right under the Equal Protection Clause to equal consideration in her application for a position on the Board. *See Ne. Fla. Chapter of Assoc. Gen. Contractors*, 508 U.S. at 666 (holding that the injury-in-fact in a case involving racial discrimination is "the inability to compete on an equal footing"). Third, the TRO would serve the public interest, as "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019); *see also Faust*, 519 F. Supp. 3d at 477 ("[I]t is 'always in the public interest to prevent the violation of a party's constitutional rights.'" (quoting *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001))).

The balance of equities also weighs in favor of granting the TRO. The enforcement of an unconstitutional statute will cause irreparable harm to the Alliance and to Member A in particular. Conversely, a delay in appointment of new Board members would cause no harm. The current board members hold their positions by law until new members are appointed. Ala. Code 34-27A-4. The current board has served for years beyond its appointed term with no ill effects. The Governor agrees that the Board will continue to function if the preliminary injunction issues. Opposition at 16. But she argues that the Board suffers for lack of its public member representative,

---

[6] During the Court's Status Conference on Tuesday, March 12, the Court asked if counsel was aware of examples where a court had struck down a statewide discriminatory Board mandate. Plaintiff's counsel recently litigated such a case to final judgment in Iowa, *Hurley v. Gast*, No. 4:22-cv-00176S-SMR-SBJ, 2024 WL 124682 (S.D. Iowa Jan. 11, 2024).

since that spot has been vacant since 2021. It seems that if, as she now claims, the Board urgently needed the public representative to function properly, she would not have let that spot sit empty for years before the start of this litigation. The same is true of current Board members serving beyond their term limits, as was the status quo for years before this litigation.

Finally, there was no delay here that would militate against the granting of a TRO. *Cf. Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (preliminary injunction denied after more than five months of ongoing trademark usage went unchallenged). In *Wreal*, the plaintiff let the defendant use its alleged proprietary trademark for over five months before filing an "urgent" preliminary injunction. Because the harm had been ongoing for months, it was difficult to believe that Wreal, LLC, suffered an imminent and irreparable harm. Here, by contrast, the harm has only just occurred as the Governor made her appointments just days ago. The Alliance filed both the suit and this motion promptly to prevent such harm.

The Alliance did not delay in filing this case due to "lack of diligence," as the Governor alleges. Opposition at 17. It filed immediately after Member A applied for the Board position. To be sure, the public member position had been open for some time. But, of course, the Alliance did not have standing to bring suit until its own member faced unlawful discrimination in her application. Thus, it could not have brought this case until she applied. Once it had standing, it brought suit immediately.

Nor did it delay in filing this motion. According to the link the Governor provided (https://alison.legislature.state.al.us/confirmations), the appointments were publicly introduced on Wednesday, March 6, 2024. The Alliance filed this TRO the following Monday, March 11. Thus, only two business days elapsed between the public introductions and the TRO filing—a reasonable

amount of time for drafting and not an indication of "lack of diligence." Contrary to the Governor's argument, neither time period weighs against the granting of a TRO.

## V.    A Mandatory Injunction Requiring the Withdrawal of Nominations Is Appropriate

The Alliance's goal in seeking a TRO is simply to preserve the status quo to allow this Court to adjudicate its rights before the instant opportunity for Member A to be appointed to the Board ends. As the Alliance noted above, this Court's power to grant equitable relief is broad and flexible. There are several ways the Court could tailor a temporary injunction that would prevent the Governor from succeeding in her effort to moot this case. The most straightforward way would be to issue an order directing her to withdraw all the nominations made after the Alliance filed this case and refrain from making new ones until Member A's rights have been adjudicated. But the Court could also preserve Member A's ability to obtain relief by merely requiring withdrawal of the four members newly nominated who were not on the Board before, or even just the three members nominated to satisfy the racial quota. Any of these would be appropriate, especially considering the Governor has admitted the statute is unconstitutional.

It is true that any such injunction would be mandatory, but that is not fatal to the Alliance's motion. Indeed, mandatory injunctions "affirmatively compelling the doing of some act, rather than merely negatively forbidding continuation of a course of conduct, are a traditional tool of equity." *Alabama v. United States*, 304 F.2d 583, 590 (5th Cir. 1962). While such injunctions are granted only "in rare instances in which the facts and law are clearly in favor of the moving party," *Miami Beach Federal Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958), this is unquestionably one of those instances.

As discussed above, the Alliance's likelihood of success on the merits and the irreparable harm to Member A if a TRO does not issue are near certainties. *See* Section IV, *supra*. The

Governor concedes that there will be no harm to the state in delaying the Board members' confirmations, Opposition at 16, which tips the scale decidedly in Member A's favor. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020) (loss of constitutional right outweighed government's asserted harms). And because the Governor agrees with the Alliance that Ala. Code § 34-27A-4 is unconstitutional, and "the public ... has no interest in enforcing an unconstitutional law," the Alliance more than satisfies the public interest showing required for a TRO. *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). There is no question that the Alliance has met even the heightened requirements for a mandatory injunction, and this Court should not hesitate to grant the remedy it seeks. *See Fox v. City of West Palm Beach*, 383 F.2d 189, 194 (5th Cir. 1967).

Even without such a clear showing, it has long been true that "after a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided." *Jones v. Securities and Exchange Comm'n*, 298 U.S. 1, 17–18 (1936); *Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo.").

Here, fifteen days after being served with a lawsuit seeking a permanent injunction forbidding her to enforce or attempt to enforce the racial mandate in Ala. Code § 34-27A-4 and Ala. Admin. Code 780-X-1-.02, the Governor did exactly that. *See* Opposition at 6. It is fully within this Court's broad discretionary power to restore the status quo pending the resolution of this lawsuit. *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) (preliminary injunction requiring university to reinstate two varsity athletic teams was within district court's discretionary power); *E.A. Renfroe & Co., Inc. v. Moran*, No. 06-AR-1752, 2006 WL 8441172, at

*6 (N.D. Ala. Dec. 8, 2006) (preliminary injunction ordering defendants to deliver copies of documents to plaintiff).

In short, the Court should issue a mandatory injunction to restore and preserve the status quo while Member A's constitutional rights are adjudicated.

## VI.    As an Alternative, the Court Can Rule on Summary Judgment Under Federal Rule of Civil Procedure 65(a)(2)

In the alternative, the Alliance asks this Court to consolidate the hearing on its Motion for TRO/Preliminary Injunction with the trial on the merits. Fed. R. Civ. P. 65(a)(2); *see, e.g.*, *Paris v. U.S. Dep't of Hous. & Urb. Dev.*, 713 F.2d 1341, 1345 (7th Cir. 1983) ("It is clear that a court has discretion to order that a trial on the merits be advanced and consolidated with a hearing on a preliminary injunction either before or after the commencement of the hearing."). Both parties have notice of the possibility that the case would be resolved at the preliminary injunction hearing, which is scheduled for March 18, 2024.

"Fed. R. Civ. P. 65(a)(2) wisely permits the district court in an appropriate case to hear a motion for preliminary injunction and conduct a hearing on the merits at the same time." *Gellman v. Maryland*, 538 F.2d 603, 604 (4th Cir. 1976) (quoting *Singleton v. Anson Cnty. Bd. of Educ.*, 387 F.2d 349, 351 (4th Cir. 1967)). And "[c]ivil rights cases are especially suitable for such simultaneous development." *Singleton*, 387 F.2d at 351. Here, consolidation under Rule 65(a)(2) is particularly appropriate because the parties have agreed on all relevant facts and on the merits. The only contested issues are standing and the appropriate relief, both of which are legal issues that do not require a trial. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that in some circumstances "an expedited decision on the merits [would] be appropriate"). Those issues have been fully briefed and do not require further factual development. *See Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*, No. 19-CV-01136 (APM), 2019 WL

2063207, at *1 (D.D.C. May 9, 2019) ("The sole question before the court ... is fully briefed, and the court can discern no benefit from an additional round of legal arguments. Nor is there an obvious need to delay ruling on the merits to allow for development of the factual record.").

There is good reason to consolidate for resolution on the merits. If the Court is satisfied that it has jurisdiction over the case—and it ought to, *see supra* Part 2—it can dispense with the preliminary relief needed to maintain the status quo and simply grant Plaintiff the permanent relief it seeks in its Complaint. After all, both parties agree the statute is unconstitutional.

Plaintiff recognizes that this could result in the current appointees being confirmed by the Alabama Senate. But the Alliance would have also received everything it asked for in its complaint—a declaration that the statute and regulation are unconstitutional and an injunction preventing the Governor from enforcing them.[7]

DATED: March 17, 2024.

Respectfully submitted,

/s/ Joshua P. Thompson
JOSHUA P. THOMPSON*
Cal. Bar No. 250955
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
JThompson@pacificlegal.org
*Pro Hac Vice*

*Attorney for Plaintiff*

---

[7] This seeming anomaly arises because the complaint seeks prospective relief and the TRO/preliminary injunction seeks a retrospective return to the status quo. But it is no absurdity. If the Court were to grant the relief asked for in the complaint, the Alliance's injury will have been completely remedied. Stated differently, if maintaining the status quo is necessary for the Court to have jurisdiction, the TRO/preliminary injunction must issue. But if the Court is satisfied that it has jurisdiction now and there are no disputes of fact or law, it can resolve the case on summary judgment. In such a scenario, Member A may have a theoretical claim for unequal treatment given the Governor's unconstitutional past actions, but such a suit is highly unlikely given the minimal damages and the Governor's qualified immunity.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court via CM/ECF which will send notification to all counsel of record:

Brenton Merrill Smith at Brenton.Smith@AlabamaAG.gov.

Benjamin M. Seiss at Ben.Seiss@AlabamaAG.gov

James William Davis at Jim.Davis@AlabamaAG.gov

/s/ Joshua P. Thompson
JOSHUA P. THOMPSON
*Attorney for Plaintiff*