```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4    AMERICAN ALLIANCE FOR EQUAL RIGHTS,

5         Plaintiff,

6    Vs.                          CASE NO.: 2:24cv104-RAH

7    KAY IVEY,

8         Defendant

9              *  *  *  *  *  *  *  *  *  *  *  *  *

10                      MOTION HEARING

11             *  *  *  *  *  *  *  *  *  *  *  *  *

12        BEFORE THE HONORABLE R. AUSTIN HUFFAKER, JR., UNITED STATES

13   DISTRICT JUDGE, at Montgomery, Alabama, on Monday, March 18,

14   2024, commencing at 9:00 a.m.

15                        APPEARANCES

16             (All appearances via telephone)

17   FOR THE PLAINTIFF:      Mr. Joshua P. Thompson
                             Attorney at Law
18                           PACIFIC LEGAL FOUNDATION
                             555 Capitol Mall, Suite 1290
19                           Sacramento, California

20   FOR THE DEFENDANT:      Mr. Benjamin M. Seiss
                             Mr. Brenton M. Smith
21                           Mr. James W. Davis
                             OFFICE OF THE ATTORNEY GENERAL
22                           OF ALABAMA
                             501 Washington Avenue
23                           Montgomery, Alabama

24           Proceedings reported stenographically;

25             transcript produced by computer
```

```
 1        (The following proceedings were heard before the Honorable
 2         R. Austin Huffaker, Jr., United States District Judge, at
 3         Montgomery, Alabama, on Monday, March 18, 2024, commencing
 4         at 9:00 a.m.:)
 5              THE COURT:  This is Judge Huffaker.
 6              THE COURTROOM DEPUTY:  Good morning, Your Honor.  For
 7   the plaintiff I have Mr. Thompson, and for the defendant I have
 8   Mr. Seiss, Mr. Smith, and Mr. Davis.
 9              And before we begin, I need to read a statement,
10   please, because we have Ms. Getachew on the line.
11              Members of the public and the media who access this or
12   any hearing remotely are reminded that you are prohibited from
13   recording or broadcasting court proceedings.  I direct you to
14   the Court's general orders and local rules, specifically local
15   rule 83.4, found on our website, for specific information
16   regarding the prohibition against recording or broadcasting
17   court proceedings and the penalties for doing so.  In short, you
18   may not record or broadcast this proceeding.
19              You're ready to go, Judge.
20              THE COURT:  Good morning.  So I've got Mr. Thompson for
21   American Alliance, and then I've got three attorneys for the
22   governor.  Who's going to be the primary spokesperson?
23              MR. SEISS:  Your Honor, this is Ben Seiss.  I will be
24   the primary spokesperson.
25              THE COURT:  All right.  I've gone back and read
```

1    everything that's been submitted.  That includes plaintiff's

2    response from yesterday and the governor's filings on Thursday.

3          All right, Mr. Thompson.  This is your motion.  I've

4    got -- we've got the motion for a TRO/preliminary injunction.

5    I've also got the governor's motion to strike Member A.  I want

6    to talk about that a little bit more in detail, and I'll

7    probably have some questions for you-all as we go through this.

8          Mr. Thompson, you've got the floor.

9          MR. THOMPSON:  Thank you, Your Honor.

10          I haven't prepared much for an opening statement.  I

11   think the briefing that we have filed explains the reasons why

12   we thought a temporary restraining order here was initially

13   required.  After the governor agreed to consolidate that with a

14   preliminary injunction, we think that is the easiest course to

15   ensure that the status quo is preserved so that our client's

16   meritorious -- which I think everybody agrees at this point that

17   it is at least on the legal claim meritorious -- legal claim can

18   be heard by this Court.

19          We think the governor's actions as we saw them

20   initially, when we learned of her decision to appoint members to

21   the Real Estate Appraisers Board after the lawsuit was filed in

22   two separate batches, was suspicious, and her submission to this

23   Court I think only confirmed our suspicions.  Because of that

24   and because of the arguments that we anticipate her making and

25   that she has made in her papers, that her unilateral actions

1  have mooted or have denied the injury to our client, we think it

2  is in this Court's power and in the -- and for justice's sake to

3  enjoin or mandatorily enjoin the governor from going through

4  those nominations or appointments by ordering her to withdraw

5  them.

6        We recognize the extreme nature of that remedy, but

7  that is a result of the governor's actions in this case.

8  Because of that, we think the TRO should go forward or the PI.

9  If the Court is ready to rule on summary judgment, because we

10  think we have clearly established standing here, we think that

11  is appropriate as well, we put in our papers, and the Court

12  has authority to do that under Federal Rule of Civil Procedure

13  65(a)(2).

14        With that, that's all of our papers.  I welcome the

15  Court's questions.

16        THE COURT:  Okay.  All right.  Do you intend to submit

17  any other materials, evidence, or argument on the pending

18  motions?  And not other than what we're talking about here, but

19  in writing.

20        MR. THOMPSON:  Not at this time, I do not anticipate

21  submitting any further evidence, Your Honor.

22        THE COURT:  All right.  I certainly understand that you

23  are challenging the clause or sentence in the statute and in the

24  regulation that states that no less than two of the nine board

25  members shall be a minority race.  What about the other sentence

1    that the overall membership of the board shall be inclusive and

2    reflect the racial diversity of the state?  Are you challenging

3    that?

4         MR. THOMPSON:  Yes, Your Honor.  We are challenging

5    that.  I think that is fairly encompassed within the complaint

6    as it was pled.  As we replied to the governor's argument in our

7    reply filed yesterday, we think binding Eleventh Circuit

8    precedent requires the Court to also enjoin that language

9    because it necessarily, if it has any force whatsoever, puts the

10   thumb on the scale in favor of racial discrimination.

11        THE COURT:  And then of the nine seats -- I know we

12   talked about some of this last week, but of the nine seats, you

13   want me to enjoin the nomination of all of the nominees or just

14   the public at large or of just the three nominees who happen to

15   be of a minority status?

16        MR. THOMPSON:  Your Honor, I think there are multiple

17   ways the Court could preserve the status quo.  I think the most

18   straightforward way is to enjoin the governor from making the

19   appointments that she did after this was filed.  That was the

20   action that necessitated this motion.

21        If the Court is uncomfortable with enjoining all nine

22   appointments, I think the Court could maintain the status quo

23   sufficiently by just enjoining the four that were not -- that

24   were new nominations; in other words, not holdovers.  I think

25   the Court could rule that.  It could also enjoin the three that

1  satisfied the racial quota.  So either of those I think would

2  maintain the status quo and would defeat the governor's attempt

3  to moot this case.

4          THE COURT:  Now, you're inferring this, that the

5  governor's actions are an effort to moot the case, and I want to

6  make sure I'm clear in understanding your position.

7          Member A has applied for the public at large position;

8  is that correct?

9          MR. THOMPSON:  Yes, Your Honor.

10         THE COURT:  And at least I'm inferring from your

11 argument that because Mr. Mills, who is being appointed or who

12 has been nominated to that position -- because Mr. Mills is a

13 minority, he's Black, that his appointment was because of the

14 racial quota and not because he may have been more qualified

15 than everybody else that applied for the position?

16         MR. THOMPSON:  Your Honor, I have nothing to say about

17 Mr. Mills in particular.  I think the injury in an equal

18 protection context is the inability to compete on a level

19 playing field.  What we are alleging is that the governor has

20 followed the commands of the statute in her appointments, and

21 therefore our client was not allowed to compete on a level

22 playing field.  Whether in fact Mr. Mills is more qualified, he

23 very well may be, but what is undoubtedly true is that the

24 governor undertook these actions pursuant to the statute that

25 forces her to consider race when she made these appointments in

1  two separate batches in an effort to prevent our client from

2  having her day in court.

3          THE COURT:  Now, when you say your client, you're

4  talking about Member A; is that correct?

5          MR. THOMPSON:  I misspoke.  Our client is the Alliance.

6  Member A is a member of the Alliance.  I do not represent Member

7  A, but she is a member of my client's organization.

8          THE COURT:  Okay.  So why should I infer that the

9  appointment of Mr. Mills was because of the racial quota rather

10  than strictly the qualifications of the applicants?

11          MR. THOMPSON:  I don't think you should make that

12  inference, Your Honor.  I think what you should do is you should

13  return this case to the status quo when the complaint was filed

14  before the government undertook these appointments and allow our

15  client -- or allow our client's member to compete on a level

16  playing field.

17          If after that the governor appoints Mr. Mills, that is

18  perfectly legitimate.  Mr. Mills may very well be the most

19  qualified person for this job, but he did get an advantage

20  because of his race.  The statute requires the governor to put a

21  thumb on the scale on the basis of race in more than one way.

22          THE COURT:  What evidence do you have that the governor

23  actually applied the racial quota and did not -- compared to

24  totally ignoring it because of a belief that the quota was

25  unconstitutional?

1         MR. THOMPSON:  We have no evidence of that, Your Honor.

2    We do think that the governor is required to follow the law, and

3    she has certainly made no disavowing of following the law.  It

4    is a requirement in Alabama that she do that.  And as a

5    prospective matter, which our claim in the complaint seeks

6    prospective relief, it's hard to see how a law that mandates the

7    governor consider race does not influence the governor's

8    decision making in her nomination.

9         THE COURT:  You have taken a position in the filings

10   that Member A is otherwise qualified for the position but for

11   her race.  When did she submit her application?

12        MR. THOMPSON:  I believe -- and I don't have this

13   information in front of me right now.  I believe it was the

14   Friday before the lawsuit was filed.  I think the lawsuit was

15   filed on a Monday or Tuesday.  Again, Mr. Roper would know this

16   better, but it was shortly before we filed the lawsuit.

17        THE COURT:  And why had she not submitted it earlier?

18        MR. THOMPSON:  I don't know that she was interested in

19   the position.  We -- well, a couple of things, I think.  At one

20   point she had contacted us, and we were considering filing on

21   her behalf.  And when she expressed concerns about being a

22   public face, we decided to reach out to the Alliance.

23        Obviously, none of this is in the record, Your Honor.

24   I'm just giving you my understanding of the facts.

25        The Alliance -- she supported the Alliance's mission,

1  joined the Alliance, and after that applied for the position,

2  and we brought suit shortly thereafter.

3         THE COURT:  And what is her talent in particular?  I've

4  got Mr. Mills' application package.  The governor filed it, so

5  I've got his CV and a questionnaire which I assume is something

6  the governor requires nominees for any position or applicants

7  for any nominated position to complete.  So what is Member A's

8  talent and expertise that she would bring to this board?

9         MR. THOMPSON:  Your Honor, this is a consumer.  This is

10 a statewide consumer position.  I think she brings a belief in

11 holding government accountable to the people in a strict

12 adherence to norms of the statute; to constitutional norms.  I

13 don't know -- I don't know more than that.

14         I think it is, as I said before, quite possible that

15 Mr. Mills would be the governor's choice, but that's not the

16 injury in an equal protection context.  Whether or not she's the

17 most qualified is of no moment, frankly.  It's whether or not

18 she had the opportunity to compete fairly because of her race,

19 and that is unquestionably not the case here because the statute

20 requires the governor to consider race.  So whether or not she's

21 the worst qualified person in Alabama does not matter so long as

22 she meets the requirements under the statute and her race is not

23 a factor.  Here her race was a factor, and that's what the Court

24 needs to enjoin.  As everybody agrees, that statute is

25 unconstitutional.

1       THE COURT:  Well, I'm just looking at the application

2   that Mr. Mills submitted, and I assume Member A submitted a

3   similar application.  What's her occupation?

4       MR. THOMPSON:  Right now -- Your Honor, I think by

5   giving that occupation, it would identity her.  I'm happy to

6   submit that.  She holds a unique position in Alabama that I

7   don't think anybody else in the state holds, so I -- it is a

8   temporary position.  I think she does plan to become a

9   full-time, stay-at-home mom in the future.  That role would

10  allow her to sit on the real estate appraiser's board as a

11  function of what she is capable of doing.

12      THE COURT:  Is she a registered lobbyist?

13      MR. THOMPSON:  No.  I don't think -- I speak out of

14  turn.  I don't know exactly if she is or not.  That's not what

15  her occupation is.

16      THE COURT:  Her spouse, what is the occupation of her

17  spouse?

18      MR. THOMPSON:  Not a hundred percent on that, Your

19  Honor.  I think he's a lawyer, but I don't want to -- I don't

20  want to say for certain.

21      THE COURT:  Okay.  Is he a registered lobbyist?

22      MR. THOMPSON:  No.

23      THE COURT:  Has Member A applied for any other

24  appointments during the governor's administration?

25      MR. THOMPSON:  Not to my knowledge, Your Honor.

```
 1              THE COURT:  Has Member A ever been a registered
 2    lobbyist in the state of Alabama?
 3              MR. THOMPSON:  Not to my knowledge, Your Honor.
 4              THE COURT:  Is there anything in Member A's social
 5    media or public record that would embarrass the office of the
 6    governor if Member A was to be appointed?
 7              MR. THOMPSON:  Not to my knowledge, Your Honor.
 8              I get the point of Your Honor's questions is to ask me
 9    whether she is qualified for this role.  If it would help the
10    Court, I can submit a subsequent declaration from her going
11    through the qualifications and indicating --
12              THE COURT:  Well, we're here today on your TRO.  We
13    don't have time to wait for her or you to get things together
14    for her.  You're asking me to enjoin a nomination by the
15    governor under very expedited circumstances because of a concern
16    that Mr. Mills and these other individuals will come out of
17    committee Wednesday and potentially be confirmed on Wednesday.
18              So I've got a few more on here.  In the last five
19    years, has Member A or is she presently involved in any agency
20    proceeding or civil litigation, including proceedings regarding
21    a professional license or certification?
22              MR. THOMPSON:  Not to my knowledge, Your Honor.
23              THE COURT:  Has Member A ever been a party or involved
24    in any civil or criminal legal proceedings?
25              MR. THOMPSON:  Not to my knowledge, Your Honor.
```

 1          THE COURT:  Has Member A ever been the subject of a

 2   complaint of discrimination on the basis of sex, race, religion,

 3   national origin, age, or disability filed in court or with an

 4   administrative agency?

 5          MR. THOMPSON:  No.  Not to my knowledge, Your Honor.

 6          THE COURT:  Does Member A have any expertise in real

 7   estate or real estate appraisals?

 8          MR. THOMPSON:  No.  Not to my knowledge, Your Honor,

 9   and the public member is not supposed to have that

10   qualification.

11          THE COURT:  They're not to have -- they can't have any

12   experience in the real estate industry?  I understand they

13   cannot serve as a real estate appraiser, but what about in the

14   real estate industry?

15          MR. THOMPSON:  That's a question better directed to

16   Governor's counsel.

17          THE COURT:  Is Member A a member of the National

18   Association of Realtors or the Alabama Association of Realtors

19   or the Alabama Association of Realtors RPAC --

20          MR. THOMPSON:  Not to my knowledge --

21          THE COURT:  -- or any leadership class of the Alabama

22   Association of Realtors?

23          MR. THOMPSON:  Not to my knowledge, Your Honor.

24          THE COURT:  And so let's just assume that I was to

25   enjoin the nomination of that public at large seat.  What's the

1  next step?

2      MR. THOMPSON:  The next step, Your Honor, would be to

3  move to an expedited hearing on the merits.  I think that the

4  Court can and ought to do so, given that there are such little

5  factual disputes here.

6      If the governor needs some discovery into our client's

7  standing, of course, we are going to object pretty vehemently to

8  the anonymity as the Eleventh Circuit allows that sort of

9  posture in these types of cases.  But that could be possible.

10 But I don't see that there's any dispute of fact here, and I

11 would urge the Court to move swiftly to ultimate resolution of

12 this case so that the governor can fulfill her functions to

13 nominate the full Real Estate Appraisers Board.

14     THE COURT:  Looking at Member A's declaration, there's

15 a pretty broad statement that says she fears the possibility of

16 reprisal.  Explain to me that concern.  Because she's applying

17 for a position, a public facing position.  She has submitted an

18 application to the governor.  I think it would be subject to an

19 open records request if somebody was to send it.  So what's the

20 fear here, and why does she need to remain anonymous?

21     MR. THOMPSON:  Sure, Your Honor.  The fear is not

22 serving on the commission.  She would -- she is -- would like to

23 do that and, of course, that is a public facing role.  The fear

24 is bringing a civil rights lawsuit where she is calling out the

25 governor of Alabama for her racial discrimination.

1         As the declaration Mr. Bloom submitted detailed Abigal

2    Fisher's quest to challenge racially discriminatory admissions

3    at the University of Texas, and she was subject to certain, you

4    know, very negative -- both in social media and in public, in

5    the newspapers, et cetera, our client's fear is that challenging

6    the governor in a statute that requires the governor to

7    discriminate will subject her to reprisals from maybe not the

8    governor, but the public.  And certainly being a public facing

9    name in a statute challenging racial discrimination in Alabama

10   is something that people ought to take seriously.  And she takes

11   her privacy seriously.  And in this role, she wants to challenge

12   the constitutionality of the statute, but she doesn't believe

13   that she needs to make her name known in order to do that

14   successfully.  And I think the case law on that point is quite

15   clear.

16         THE COURT:  Let me just throw this out there because

17   the time line -- as much as the concern that you raise about the

18   time line with respect to the governor's appointment has some

19   inferences, there would be a similar concern about the time line

20   of Member A seeking the appointment of this position a day or so

21   before the lawsuit was filed.  Does she really have a true, bona

22   fide intent to obtain a seat, or is she just a tester?

23         MR. THOMPSON:  Your Honor, she has applied for a seat

24   on this commission.  She is prepared and willing, and her

25   declaration says she wants to serve in that spot.

1          Certainly she does believe in the mission of the

2     Alliance.  The Alliance is an organization established to

3     challenge racial classifications both at the federal level and

4     the state level, and that marriage of interests in this position

5     and objection to the unconstitutional discrimination made this a

6     proper civil rights lawsuit, but I don't think that discounts

7     her true declaration as it was submitted to this Court.

8          THE COURT:  Mr. Seiss, I'm going to turn to you next.

9     I'll have some questions for you as well.  What is your

10    response?

11         MR. SEISS:  Thank you, Your Honor.  I think there's a

12    lot to say on the reply brief that plaintiffs submitted

13    yesterday, but I'll be short in my opening.

14         We agree on the merits, but we think there are very

15    real jurisdictional concerns that we are obligated to raise and

16    that cannot be waived.  The governor is not trying to preserve

17    some ability to racially discriminate.  If the Court is

18    concerned about the time line or gamesmanship, we have a

19    response.  We're well aware that this question will eventually

20    become ripe in the colloquial sense for judicial review, likely

21    from a suit by this plaintiff, and that we will lose that

22    lawsuit on the merits eventually, but this isn't that time.

23         And I'm happy to answer any specific questions that the

24    Court has.

25         THE COURT:  I know you have taken the position that

1    standing may not exist, but let's just assume that I was to let

2    the -- I was to deny the TRO, preliminary injunction, let the

3    nomination go forward.  The Senate may not act on it.  They've

4    sat on these nominations before, and I assume they've sat on

5    nominations for other boards and agencies before.  Would there

6    still be a live case or controversy if Mr. Mills is confirmed?

7           MR. SEISS:  Your Honor, so we haven't argued mootness,

8    and with the amount of time I've had to prepare, I want to say

9    that this is kind of my off-the-cuff thoughts.  I think in terms

10   of just general mootness, that if he is confirmed, the kind of

11   injury that we're talking about here, that would definitely be

12   moot.

13          Now, we're not saying that an exception might not

14   apply.  We haven't fully looked into that.  Off the cuff, I

15   think probably it would be capable of repetition yet evading

16   review, but, again, we have not fully looked at that issue.

17          THE COURT:  Are you really arguing -- the nomination

18   currently as postured, and that's with the governor having made

19   her decision to nominate, all of the nominations are still

20   pending confirmation.  When we get down to it, wouldn't you at

21   least agree there is standing by the plaintiff to pursue the

22   claims at present?

23          MR. SEISS:  No, Your Honor.  I would not agree that the

24   plaintiff has standing to pursue the claims at present.

25          THE COURT:  All right.  Well, let's just assume, then,

1  that the governor had not made any of these nominations; that

2  the status of the board was in the position as it existed

3  February 1.  Would the plaintiff have standing at that point?

4      MR. SEISS:  Your Honor, for prospective injury, the

5  plaintiff has to show a real and immediate threat of future

6  injury.  I think under the facts as you presented them, I'm not

7  sure that the plaintiff could do so.  I don't think the

8  plaintiff has satisfied that burden now as to future prospective

9  relief, so, no, I don't think so.

10      THE COURT:  So when would the plaintiff be able to make

11  the showing of a real and immediate threat of injury?  When is

12  that window or when does that occasion arise?

13      MR. SEISS:  Your Honor, I think if there -- I think if

14  there was evidence that the appointments were being made to the

15  positions and -- I think probably, given the 2023 appointments,

16  that that evidence would be sufficient.

17      THE COURT:  The governor could pull this nomination at

18  any time; is that correct?

19      MR. SEISS:  Your Honor, we haven't had the opportunity

20  to fully dig down into that.  I think there's some Alabama

21  Supreme Court authority that suggests otherwise, but we're not

22  sure whether it's on all fours.  I think implicitly in the power

23  to appoint, there's a power to withdraw, but, again, we have not

24  fully researched that issue.

25      THE COURT:  And let's just assume Mr. Mills and these

1    others get confirmed Wednesday.  These are for three-year terms;

2    is that correct?

3              MR. SEISS:  Not exactly, Your Honor.  I believe

4    Mr. Mills' term would expire -- I want to say it's March 26th of

5    2026.  The dates are not uniform for reasons I don't fully

6    appreciate.

7              THE COURT:  They're staggered is what it sounds like.

8    He could resign at any time, I would assume?  He doesn't have to

9    fill out his term; correct?

10             MR. SEISS:  That's correct.  I think so, Your Honor.  I

11   don't have the language right in front of me.  I represent the

12   podiatry board, and in our statute it says the member shall

13   serve the term.  But I don't think that anyone would force

14   Mr. Mills to continue the term if he so desired to leave.

15             THE COURT:  And the governor would have the ability to

16   remove him from office?

17             MR. SEISS:  Your Honor, I think the statute provides

18   for a for-cause removal option, but I'm not certain of that.

19             THE COURT:  All right.  Well, let's just assume

20   hypothetically that he's confirmed, this case proceeds on, and

21   that at some point it becomes apparent that Mr. Mills was

22   appointed because of the quota obligations.  Can the governor

23   remove him?

24             MR. SEISS:  I'm not sure, Your Honor.  I tend -- I

25   don't think that would meet the kind of traditional for-cause

1  removal.  I think the language refers to, like, not doing his

2  job; not showing up for meetings.  The concern that Your Honor

3  is expressing sounds like something more suitable for like a quo

4  warranto action.

5        THE COURT:  What is your position on behalf of the

6  governor as to -- I know -- let me back up.  According to your

7  brief, you recognize that the quota language is

8  unconstitutional.  Outside of that, has there been any court

9  decision or Attorney General's opinion that has made that same

10 declaration or taken that same position before the filing of

11 this brief?

12       MR. SEISS:  Your Honor, as to this specific racial

13 quota, no, I don't believe there are any court opinions and

14 there are no AG opinions that I'm aware of.

15       THE COURT:  For purposes of these nominations, was the

16 language, the quota language, actually honored by the governor,

17 or was it ignored as unconstitutional?

18       MR. SEISS:  Your Honor, in the limited time that we've

19 had this motion, we have not been able to have a sit-down

20 conversation with the governor or her appointments director to

21 truly know the answer to that question.  I will say in the

22 conversations that we've had with the governor's legal counsel,

23 we have received no indication that she was intentionally

24 enforcing the quota.  I think the only evidence in this case as

25 to the quota is just that the quota was satisfied.  In

1    plaintiff's reply brief, they used the language "followed the

2    quota," and I think that would not even stand up on 12(b)(6)

3    review.  I think Twombly says you have to have more -- your

4    allegations have to be more than it being consistent with the

5    quota, and there's no evidence beyond that in this case.

6             THE COURT:  Okay.  I'm just thinking down the road if

7    this case was to get into discovery.  Would the governor ever be

8    forced to explain the basis for any of these nominations?  I

9    would think there's some sort of deliberative or executive

10   privilege that may exist there, but would the governor ever have

11   to explain why she appointed person A over person B or any of

12   these other nominations?

13            MR. SEISS:  Your Honor, I haven't researched that, but

14   I wouldn't think so, and our office would strongly argue against

15   discovery into that.  That's a core discretionary function of

16   the governor.  We're talking about -- that's just quintessential

17   government, and that deliberative process is not something that

18   should be disclosed in our view.

19            THE COURT:  Have you seen the application submitted by

20   Member A?

21            MR. SEISS:  Your Honor, we have no way to know.  We

22   have seen what purport to be all the applications received for

23   the public member position since 2023, and we can hazard a guess

24   as to which of those is Member A based on the identifying

25   features that we have, but we do not know for sure that who

1    plaintiff claims Member A to be submitted an application.

2          THE COURT:  Well, and I don't really ask that from the

3    point of view of who Member A claims to be.  I'm asking it from

4    the point of view of if I compare Member A versus Mr. Mills or

5    anybody else that applied for the public-at-large position, from

6    a qualifications standpoint of who would best serve that

7    position, where does Member A stand?

8          MR. SEISS:  Your Honor, I don't personally dispute the

9    premise of Your Honor's questioning, but I cannot represent what

10   the appointments director or the governor considered in making

11   this appointment, so I can't answer that question.

12         THE COURT:  As it concerns handling of Member A, is

13   your position that I should either just ignore the declaration

14   or should I strike it or should I require the uncloaking of that

15   individual's name?  What's the governor's position?

16         MR. SEISS:  Your Honor, I think the procedural vehicle

17   we're not particularly concerned about.  It should either be

18   stricken, or it should be entitled to zero weight to satisfy

19   their preliminary injunction burden.  I -- yes.  I say that's

20   our position.

21         THE COURT:  All right.

22         MR. SEISS:  We'd like an opportunity to confirm who

23   Member A is, because we think there are valid due process

24   concerns with our ability to defend this case, to make arguments

25   that nonracial reasons were considered in the appointment of

1  Mills.

2        THE COURT:  Did you not get copied on that email to my

3  office Friday?

4        MR. SEISS:  No, Your Honor.  And from the status

5  conference, I didn't understand us to be getting that

6  information.

7        THE COURT:  Mr. Thompson, what's the concern with

8  letting the attorneys for the governor know who Member A is?

9        MR. THOMPSON:  Your Honor, if we could have a

10  protective order and we could do that in camera, I don't think

11  we do have an objection.  The concern is that that name becomes

12  public.  And if the governor's counsel is willing to enter a

13  protective order for that purpose, then I think that would be

14  appropriate.

15        THE COURT:  Okay.  And I have no idea how many people

16  applied for the position, but I think that's a name that's

17  fairly discoverable on your end, Mr. Seiss, since it's a female

18  who lives in Prattville.

19        All right, Mr. Seiss.  Let's just assume that I believe

20  that there is standing here, that I think that standing would

21  continue to exist even if the appointment was to go forward, and

22  Mr. Mills and all the others were to get confirmed.  What's the

23  next step or posture of this case, given the governor's position

24  as to the unconstitutionality of the quota?

25        MR. SEISS:  Your Honor, we think that we're entitled to

1    discovery into the identity of Member A and to pursue the

2    potential nonracial reasons that were considered in appointing

3    Mr. Mills over Member A.

4            THE COURT:  All right.  Mr. Seiss, anything else you

5    want to say?

6            MR. SEISS:  No, Your Honor.

7            THE COURT:  And Mr. Seiss, you've got your thumb more

8    on the pulse of what's going on over at the State House.  Do you

9    know for sure whether these nominations are going to be taken up

10   on Wednesday?  I can pull the agenda just like anybody else can,

11   and I can see that there's 15 to 20 nominations on the list, but

12   do you know whether they're actually going to be taken up?

13           MR. SEISS:  No, Your Honor.  I have no updated

14   information on that front.

15           THE COURT:  And what about from -- and this is putting

16   the cart before the horse, but assuming they come out of

17   committee on Wednesday, do you have any idea whether they would

18   come before the Senate either Wednesday afternoon or Thursday?

19           MR. SEISS:  Your Honor, it's not clear to me that the

20   nominations have to go through the three-reading process that's

21   standard for usual legislation, but it appears that's the

22   process being followed.  So I would think the earliest would be

23   Thursday, but I'm not confident on that.

24           THE COURT:  So they've already had a first reading, and

25   then they could get a second reading Wednesday and third reading

1    Thursday, and that's it?

2          MR. SEISS:  That's my understanding, Your Honor.

3          THE COURT:  Mr. Thompson, anything else you want to

4    address or say?

5          MR. THOMPSON:  Yes.  There are a few points that I

6    would like to mention in response to the governor's argument

7    today.

8          I think it was quite telling that the governor said

9    that even though there were nine -- that there was only one

10   opening on February 1st, that they would still argue standing.

11   And the Court asked, when is that window for when standing would

12   be had and the governor wouldn't dispute it, and I wasn't sure

13   that there was an answer there.  So the fact that the governor

14   is making suppositions here that when there are no pending

15   nominations, there still isn't standing, is quite demonstrative

16   of their argument as to when we could have brought this lawsuit.

17   We brought this lawsuit when there were no nominations pending.

18   That ought to have been a clear case of Article III standing.

19         I think there's a little bit of confusion over the

20   difference between the injury here -- I would reiterate that our

21   injury as pled in the complaint is that equal consideration on

22   the basis of race.  Whether Member A would be chosen or whether

23   she would be chosen in the future really doesn't matter to that

24   equal protection injury.  What matters is that she just have an

25   equal shot at that, and that race not be a factor.  That is

1  unequivocal, whether the statute is followed by the governor or

2  not.

3      The Court has to presume that the governor follows

4  Alabama law.  It's in the statute.  It requires the governor to

5  do it.  That must put a thumb on the scale.  Otherwise, Alabama

6  law has no effect.

7      And we would not undertake any discovery into the

8  reasons for the governor's nomination of any particular

9  individual for that purpose.  Whether person A, B, C, D, or E is

10 chosen, it doesn't matter.  The statute requires the governor to

11 consider race.  That's what we want to have enjoined so that all

12 Alabamians can compete equally for nominations to the Real

13 Estate Appraisers Board.  So we have no desire or we don't even

14 think it's relevant why the governor has chosen any particular

15 individual.  What matters is that race not be a factor.

16     And that's all I have, Your Honor.

17     THE COURT:  Mr. Seiss, back to you.  Address the

18 statement that we have to presume that the governor followed the

19 law in February when she made the appointments, and in following

20 the law, she followed the quota requirements set out in the

21 statute.

22     MR. SEISS:  Your Honor, at this time I'm not entirely

23 sure what authority Mr. Thompson is relying on.  I'm not

24 disputing that he has some authority.  But I think it's -- the

25 governor has to -- is presumed to comply with the law, but not

1    necessarily that she's directly enforcing the racial quota.  I

2    don't think there's any evidence here that that's what she was

3    doing intentionally.

4            I think an example to illustrate this point is if there

5    was only one applicant to the public member position -- and I'm

6    not saying that's what occurred here -- and that applicant was a

7    minority, the governor didn't have to directly enforce the quota

8    requirement or directly consider race to choose that member.

9    And plaintiffs have not shown whatsoever that that wasn't the

10   case here as to any of the three positions that minorities were

11   appointed to.

12           THE COURT:  Anything else from either side?

13           Mr. Thompson, anything else from you?

14           MR. THOMPSON:  No, Your Honor.

15           THE COURT:  Mr. Seiss, anything else from you?

16           MR. SEISS:  No, Your Honor.

17           THE COURT:  All right.  We will start looking at this

18   and make a ruling as quickly as we can.  I will try to get

19   something out to you by Wednesday -- on or by Wednesday, not

20   guaranteeing it -- but if something new happens in the interim,

21   please call it to my attention.

22           I will work on a protective order.  Mr. Thompson, I

23   assume an attorneys' eyes only and governor's office eyes only

24   order is satisfactory to you?

25           MR. THOMPSON:  Yes, Your Honor.

```
1              MR. SEISS:  Your Honor, if I may.

2              On the protective order issue, I think we believe that

3    Member A's name should have to be disclosed, not like in

4    general.  There's a high showing that plaintiff has to make to

5    show that they're entitled to proceed anonymously or

6    pseudonymously.  That's the Chiquita Brands case out of the

7    Eleventh Circuit.  And they haven't done that.  They have one

8    general statement about a possibility of fear of reprisal.  That

9    doesn't carry that burden, Your Honor.

10             THE COURT:  And I understand that.  I was really asking

11   this from the point of view of, well, do you want the name now,

12   or do you want to wait?  And if you want it now, I was going to

13   create a mechanism for you to get it.

14             MR. SEISS:  That's fine, Your Honor.  Thank you.

15             THE COURT:  All right.  Anything else, Mr. Seiss?

16             MR. SEISS:  No, Your Honor.

17             THE COURT:  I appreciate it.  We will let you know

18   accordingly.  Thank you very much.

19        (Proceedings concluded at 9:41 a.m.)

20                  *  *  *  *  *  *  *  *  *  *  *

21

22

23

24

25
```

28

```
1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of the proceedings in the above-entitled matter.

4            This 22nd day of March, 2024.

5

6                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```