## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, a nonprofit corporation, | |
| Plaintiff, | |
| v. | Civil Action No. 2:24-cv-00104-RAH- JTA |
| KAY IVEY, in her official capacity as Governor of the State of Alabama, | |
| Defendant, | |
| and | |
| ALABAMA ASSOCIATION OF REAL ESTATE BROKERS, a nonprofit corporation, | |
| Intervenor Defendant. | |

## INTERVENOR DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

This Court found that the Alabama Association of Real Estate Brokers (herein "the Association") "has shown it must be heard" on this "consequential dispute . . . on a topic of great magnitude." Mem. Op. and Order 6, Doc. 54. Notwithstanding this Court's decision, Plaintiff American Alliance for Equal Rights (herein "the Alliance") asks the Court to enter judgment in its favor based on its sparse, seven-page complaint and the defensive pleadings. If the Alliance has

its way, the Racial Minorities Requirement[1] in Alabama Code § 34-27A-4 and Alabama Administrative Code 780-X-1-.02 would be declared unconstitutional without any opportunity for the development and presentation of relevant facts, nor any review of evidence by this Court.

The Alliance's Motion should be denied for two reasons. *First*, contrary to the Alliance's contention, material factual allegations in the pleadings are disputed. *Second*, the determination of whether Alabama Code § 34-27A-4 and Alabama Administrative Code 780-X-1-.02 satisfy strict scrutiny is not a pure legal question and requires a thorough examination of the facts. Because significant disputes of alleged material fact exist and remain unresolved, the Alliance's Motion for Judgment on the Pleadings must fail. Given the opportunity to present evidence developed through targeted discovery, the Association intends to show that the Racial Minorities Requirement withstands strict scrutiny.

## BACKGROUND

In a seven-page complaint, the Alliance seeks injunctive relief and a declaration that "the racial mandate"[2] in Ala. Code § 34-27A-4 and Ala. Admin.

---

[1] The Racial Minorities Requirement refers to the requirement that at least two members of the Alabama Real Estate Appraisers Board (herein "the Board") shall be of a minority race.

[2] The Association interprets the Alliance's use of "the racial mandate" and "the racial quota" as a reference to the Racial Minorities Requirement. In addition, because the Alliance expressly abandoned arguments related to the general inclusion language, that appointments "shall be inclusive and reflect the racial [and

Code 780-X-1-.02 violates the Equal Protection Clause." Compl. 7, Doc. 1 (prayer for relief). The Alliance asserts, and asks the Court to hold, that the Racial Minorities Requirement does not "serve a compelling government interest," and "[i]s not narrowly tailored to remediating past, intentional discrimination." *Id.* ¶¶ 30, 32. The pleadings closed when the Association filed its Answer on May 14, 2024.[3]  Intervenor Def.'s Answer, Doc. 55.

In moving for judgment on the pleadings, the Alliance relies on only two factual allegations, viewed in a vacuum: *first*, that the Board was created in response to the Federal Financial Institutions Reform, Recovery and Enforcement Act, and *second*, that the statute creating the Board included the Racial Minorities Requirement from the time of its enactment in 1990. Mot. 2. The Alliance does not address the Alabama Legislature's reasons for establishing and continuously

---

other] diversity of the state," Pl.'s Mot. for J. on Pleadings 1 n. 1, Doc. 56 (hereinafter "Mot."), the Association has not addressed that language in this opposition, and allegations concerning the general inclusion language should be stricken from the Complaint. *See, e.g., Hogan v. Cty of Montgomery*, No. 2:05-cv-687, 2006 WL 3052997, (M.D. Ala. Oct. 26, 2006) (dismissing claims that were expressly abandoned, as well as those that the plaintiff did not rely upon in summary judgment).

   [3] *See United States v. Georgia*, 574 F.Supp.3d 1245, 1248 (N.D. Ga. 2021) (noting that intervenor's answer "became part of the record" when the court granted the intervention motion).

reauthorizing the Racial Minorities Requirement for the last 30 years,[4] nor the Legislature's considerations when it amended the statute in 2004. *Id.* (noting that Racial Minorities Requirement was amended from "two" to "no less than two."). The Association intends to develop that evidence through targeted discovery. *See* Joint Rule 26(f) Report 4-5, Doc. 57 (identifying six areas of discovery).

The Alliance's Motion also ignores several disputed facts and affirmative defenses contained in the Association's Answer. The Association denied several material factual assertions in the Alliance's complaint including: that "members of the Alliance who are not racial minorities will never receive equal consideration for openings" on the Board, that the Racial Minorities Requirement "does not remediate any specific instances of racial discrimination that violated the Constitution or statutes," and that the law at issue "stereotypes individuals on the basis of race, mandates racial quotas, requires racial balancing, has no 'good faith exception,' and has no end date." Intervenor Def.'s Answer ¶¶ 17, 31, 33, Doc. 55. Notably, in its Motion, the Alliance failed to mention that any of these factual assertions are disputed other than the dispute about the end date. *See* Mot. 2, 3, 8 (noting that the Association "argues that 'the challenged provisions are valid and enforceable,'" and contests whether there is an end date). The Association also

---

[4] These reauthorizations are pursuant to the State's Sunset Law. Ala. Code § 34-27A-28 (noting that the Board is subject to review under the Sunset Law); Ala. Code §§ 41-20-1-16 (Alabama Sunset Law).

disputed the Alliance's claim that the Racial Minorities Requirement "does not serve a compelling government interest" and is "not narrowly tailored to remediating past, intentional discrimination." *Compare* Compl. ¶¶ 30, 32, Doc. 1 *and* Intervenor Def.'s Answer ¶¶ 30, 32, Doc. 55. That dispute, too, is absent from the Alliance's Motion.

The Association raised affirmative defenses related to the Alliance's standing including whether its members have suffered any injury and whether this Court has subject matter jurisdiction. Intervenor Def.'s Answer 5, Doc. 55 (affirmative defenses). The Association also disputed the related factual assertions primarily because the Association lacked sufficient information or knowledge to admit or deny the Alliance's claims about its organization, its members and their qualifications, including Member A, and the alleged injury. *See, e.g., id.* ¶¶ 4, 8, 20-23. The basis for the Alliance's general assertions has not been tested.

Like the Association, Governor Ivey's Answer disputed material facts related to standing and raised affirmative defenses. Governor Ivey denied that "blatant racial discrimination . . . occurred here or must occur during the appointment process to the Board," Def.'s Answer ¶ 3, Doc. 36, and that Member A "is or was ineligible to be appointed to the public member position because of the racial quota or her race." *Id.* ¶ 23. Those denials support the Governor's defense that "Plaintiff lacks standing" and has not suffered any injury because

"Defendant does not and will not enforce" the Racial Minorities Requirement. *Id.* at 4 ¶¶ 5, 6, 7.

Notwithstanding the clear denial of allegations material to the Alliance's claim and its standing, the Alliance moved for judgment on the pleadings. Instead of relying on undisputed factual allegations in the pleadings to support its Motion, the Alliance instead cites the statement of the Association's interests in support of its Motion to Intervene. Mot. 3, 6-9 (conflating the compelling State interest and the Association's legal interest in remedying "legacy of racial discrimination in housing and lending in Alabama" and "discrimination in all facets of the real estate industry in Alabama, including in licensing and appraisals").

Both AAER and Governor Ivey oppose pre-discovery disclosures and all discovery until the Alliance's Motion for Judgment on the Pleadings is resolved. Joint Rule 26(f) Report, Doc. 57.

## LEGAL STANDARD

Motions for judgment on the pleadings are permitted after the pleadings have closed, Fed. R. Civ. P. 12(c), and are "governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018). But unlike a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a motion for judgment on the pleadings seeks a final judgment on the merits based on the competing pleadings. *Perez v.*

*Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014). Judgment on the pleadings is appropriate only when there are no material facts in dispute and the movant is entitled to judgment as a matter of law after the court has considered the pleadings and any judicially noticed facts. *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002). All material facts in the nonmoving party's pleading are accepted as true and are viewed in the light most favorable to the nonmoving party. *Perez*, 774 F.3d at 1335. Like here, when a plaintiff moves for judgment on the pleadings, the factual allegations of the answer are taken to be true, but those of the complaint can only be taken as true if "they do not conflict with those of the answer." *Capitol Specialty Ins. Corp. v. W. View Apartments, Inc.*, No. 21-11675, 2021 WL 6101663, at *1 (11th Cir. Dec. 22, 2021) (citing *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." *Perez*, 774 F.3d at 1335.

## ARGUMENT

The Alliance's Motion must fail because the pleadings show plainly that two categories of material factual allegations remain disputed: One set of disputed factual allegations relates to the question of standing; the other relates to the application of the strict scrutiny test. The latter question, which incorporates the compelling state interest and narrow tailoring standards, requires a fact-intensive

inquiry that cannot be resolved as a matter of law in this case. The Alliance's Motion rests on ignoring these disputed material factual allegations and an incorrect view of Equal Protection precedent, which should be rejected.

## I. Both the Association and Governor Ivey Contest Factual Allegations Material to the Alliance's Standing.

Material factual allegations relevant to whether the Alliance has standing remain disputed and unresolved. Both Governor Ivey and the Association have raised standing and the lack of subject matter jurisdiction as an affirmative defense. Intervenor Def.'s Answer 5, Doc. 55; Def.'s Answer 4 ¶¶ 5, 6, 7, Doc. 36. And each party has disputed material facts that go to the Alliance's standing to continue this litigation, including whether Member A (Laura Clark) experienced any injury,[5] and whether the Alliance has "members who are qualified, ready, willing, and able to be appointed," Compl. 2-5, Doc. 1, to the Board. *See, e.g.*, Intervenor Def.'s Answer ¶¶ 4, 8, 20, 22, 23, Doc. 55; Def.'s Answer ¶¶ 4, 8, 20, 22, 23, Doc. 36. Moreover, the only member the Alliance has identified, Member A, was eligible for just one of the nine seats on the Board. Because the Alliance seeks to strike down the Racial Minorities Requirement as to each Board seat, it needs to identify

_____

[5] For instance, the Governor affirmatively stated in her Answer that she "was not required to consider race" and "Plaintiff is not entitled to any relief because Defendant does not and will not enforce" the Racial Minorities Requirement. Def.'s Answer ¶¶ 13, 21, Doc. 36. The Governor's position raises material questions of fact as to whether Member A sustained an injury at all.

at least one member who would be eligible for each seat. *See United States v. Hays*, 515 U.S. 737, 745 (1995) (in Equal Protection challenge to redistricting plan, plaintiffs could only challenge the constitutionality of districts in which they were eligible to vote).

Standing is not a one-time inquiry as the Alliance suggests. Mot. 9 n. 4 (arguing that standing "has already been litigated and decided"). Standing is a jurisdictional argument that can be raised at any point in the proceedings. *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance.") (citing *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). In addition, "federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *Hays*, 515 U.S. at 742 (1995) (internal quotation omitted); *see also Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 877-78 (11th Cir. 2000). Indeed, at later stages of a proceeding, Plaintiff's burden to demonstrate its standing increases. While it may have been sufficient to provide "general factual allegations of injury resulting from the defendant's conduct" to defeat a motion to dismiss, at summary judgment and beyond, the plaintiff can no longer rest on "mere allegations." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975-76 (11th Cir. 2005). Under that more demanding standard, the Association must be

9

permitted to test the standing allegations as this case progresses and the Alliance must ultimately prove the facts establishing standing.

The Association has not yet had *any* opportunity to test the Alliance's standing. The Alliance's insistence that an intervenor has "no right to relitigate the issues," Mot. 9-10 n. 4, is unpersuasive. The only case that the Alliance cites, *In re Fontainebleau Las Vegas Holdings, LLC*, No. 09-23683-CIV, 2010 WL 11721026 at *3 (S.D. Fla. July 27, 2010), is inapposite. There, the court addressed whether an intervenor could raise certain merits arguments for the first time on a motion for rehearing after a final order had been issued. *Id.* It says nothing about when standing can be litigated, nor does it fit the posture of this case. Here, the Alliance's standing has been contested in the pleadings, long before any final judgment, and the parties should have an opportunity to test the disputed allegations.

## II.  The Disputed Questions of Material Fact on the Merits Preclude Judgment on the Pleadings.

The government's use of a classification based on race, such as the Racial Minorities Requirement, will be upheld when it satisfies strict scrutiny. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("*SFFA*") ("Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as 'strict scrutiny.'"). The strict scrutiny test has two components: A racial

classification must serve a compelling government interest, and it must be narrowly tailored to further that interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). The Supreme Court has explained that strict scrutiny, though stringent, is not an impossible test. *Id.* at 237 ("[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'").

### A. Strict scrutiny demands a fact-intensive inquiry that cannot be resolved here on the pleadings.

Whether the government has a compelling interest to justify a racial classification, and whether that classification is narrowly tailored to serve the compelling interest, involve questions of fact. *See, e.g.*, *Thornquest v. King*, 82 F.3d 1001, 1004 (11th Cir. 1996) (reversing a grant of summary judgment upon finding that there may be a "genuine issue of material fact on relevant questions," including "whether the regulations are narrowly drawn to effectuate a compelling state interest"); *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895, 903 (11th Cir. 1997) ("Both the Supreme Court and this Court have held that a district court makes a factual determination when it determines whether there exists a sufficient evidentiary basis justifying affirmative action on the basis of race or ethnicity.").

The lower court histories in the Supreme Court decisions in *SFFA* and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ("*Croson*") that applied strict scrutiny demonstrate the need for the fact-finding that the Alliance argues is

unnecessary here. *SFFA* relied heavily on the factual records developed below in two consolidated cases. It was issued only *after* years of discovery in the Harvard case, a bench trial that lasted three weeks and involved testimony of 24 fact and four expert witnesses, and a more than 70-page decision that included 50 pages of findings of fact. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 397 F. Supp. 3d 126 (D. Mass. 2019). Likewise, the companion case concerning the admissions process at the University of North Carolina involved an 8-day bench trial, "record evidence … far more voluminous than that addressed in the trial transcript," and an 82-page decision including 60 pages of findings of fact. *See Students for Fair Admissions, Inc., v. Univ. of N.C.*, 567 F. Supp. 3d 580, 588 (M.D.N.C. 2021). The facts established at those trials are central to the Supreme Court's decision. *See, e.g.*, *SFFA*, 600 U.S. at 198 (describing the 15-day and eight-day trials, respectively, before engaging in legal analysis); *id.* at 193-199 (repeatedly citing the First Circuit's discussion of the facts developed at the Harvard trial as well as both the trial courts' findings of fact when providing background on the universities' admissions processes); *id.* at 214-226 (same when analyzing whether the universities' processes could withstand strict scrutiny).

Similarly, the *Croson* Court issued its decision only *after* the district court made "comprehensive findings," *J.A. Croson Co. v. City of Richmond*, 779 F.2d 181, 184 (4th Cir. 1985), and the Fourth Circuit had evaluated the relevancy of the

evidence in detail. *See, e.g.*, *id.* at 189-90 (describing the testimony and statistical evidence produced during "[t]he council debate preceding the enactment of the ordinance" at issue). The Supreme Court's decision described the factual evidence reviewed below closely in its application of relevant equal protection precedent. *See, e.g.*, *Croson*, 488 U.S. at 498-507 (describing and citing the district court's findings).

Additionally, none of the Eleventh Circuit decisions related to racial classifications that the Alliance cites were resolved on the pleadings. Rather, those decisions rest on thorough fact finding by the district courts at summary judgment or at trial. *See, e.g.*, *Virdi v. DeKalb Cnty. Sch. Dist.*, 135 F. App'x 262, 264-67 (11th Cir. 2005) (summarizing factual record on appeal of district court's summary judgment order); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1237-1243 (11th Cir. 2001) (describing "careful review of the record" including the district court's factual findings in its summary judgment order); *Eng'g Contractors*, 122 F.3d at 900 (relying on "district court's thorough opinion" to summarize the undisputed facts); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1553-1556 (11th Cir. 1994) (summarizing "first six years of litigation" including a trial that led to court ordered race conscious remedies).

Although the Alliance suggests that these cases support its argument that a factual inquiry is unnecessary here, the opposite is true. If anything, *SFFA*, *Croson*,

and other cited precedent support the need for targeted discovery[6] that will allow the Association to demonstrate that the statute is narrowly tailored to support compelling government interests here.

### B. The Association disputes factual allegations material to the compelling state interest inquiry.

The Association denies the Alliance's allegation that the Racial Minorities Requirement "does not serve a compelling government interest," and does not "remediate any specific instances of racial discrimination that violated the Constitution or statutes." *Compare* Compl. ¶¶ 30, 31, Doc. 1 *with* Intervenor Def.'s Answer ¶¶ 30, 31, Doc. 55. In the Alliance's telling, the only viable compelling government interest is remedying prior discrimination in appointments to this Board. *See* Mot. 5 ("Because the racial quota was part of the AREAB from its inception, there is no history of racial discrimination in AREAB appointments that the quota could have been intended to remedy."). The Alliance not only ignores how racial discrimination against appraisers and in appraisals may have impacted the Legislature's decision to enact the Racial Minorities Requirement in the first instance, but also that racial discrimination in appointments to the Board may have

---

[6] The Association has identified six targeted areas of inquiry for discovery that are necessary to resolve the disputed material facts here. *See* Joint Rule 26(f) Report 4-5, Doc. 57.

persisted even *after* the Racial Minorities Requirement was enacted.[7] The Alliance assumes that the existence of the statutory requirement necessarily means an absence of racial discrimination in Board appointments. But that assumption is an unwarranted leap not supported by the pleadings. In fact, the only factual assertion in the pleadings on this point suggests otherwise: The Governor, in her Answer, stated that she "does not and will not enforce" the Racial Minorities Requirement. Def.'s Answer 6 ¶ 21, Doc. 36. Even with the statutory requirement in place, if this Governor and her predecessors chose not to enforce the statute, nonenforcement could have led to racial minorities being discriminated against in Board appointments.

The Alliance's argument also fails as a matter of law. In reviewing remedial measures, the Supreme Court has acknowledged that the targeted discrimination can involve both public and private conduct, within and outside of the specific confines of a particular program. *Croson*, 488 U.S. at 492. It is well established that the history of discrimination that gives rise to a compelling governmental interest need not be express governmental discrimination, as the Alliance suggests, *see* Mot. 5 (claiming "no history of racial discrimination in [Board]

---

[7] In the Eleventh Circuit, post-enactment data, *i.e.*, data related to years after a racial classification was implemented, is permitted to demonstrate the "strong evidence of discrimination" needed to justify such classifications. *Eng'g Contractors*, 122 F.3d at 911.

appointments…"), but rather discrimination where the governmental entity has "essentially become a 'passive participant' in a system of racial exclusion." *Croson*, 488 U.S. at 491-92; *see also Eng'g Contractors*, 122 F.3d at 907 (citing *Croson*, 488 U.S. at 492). The *Croson* court indeed emphasized that "[i]t would seem equally clear, however, that a state . . . has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction," and that "any public entity, state or federal, has a compelling interest in" combatting certain private prejudice. *Croson*, 488 U.S. at 491-92; *see also Webster v. Fulton Cnty., Ga.*, 51 F.Supp.2d 1354, 1369 (N.D. Ga. 1999) (noting that a passive participant government could "take remedial action if it had evidence that its spending practices are 'exacerbating a pattern of prior discrimination' that can be identified with specificity," and that the government "may rely upon a showing of discrimination in the private sector if it provides a linkage between private sector discrimination and the [government's] policies") (citing *Croson*, 488 U.S. at 504) (other citation omitted).

Premised on its incorrect view of the law, the Alliance's position ignores several material facts that are relevant to the compelling interest inquiry, but these material facts can only be evaluated by the Court after discovery.

**C.  The Association disputes factual allegations material to the narrow
tailoring inquiry.**

Classifications based on race that serve a compelling state purpose, like

remedying discrimination, must use race "in as limited a manner as possible to

accomplish that compelling purpose." *In re Birmingham Reverse Discrimination

Emp. Litig.*, 20 F.3d 1525, 1545 (11th Cir. 1994). There is no rigid "mechanical

formula" that drives the narrow tailoring inquiry. *Eng'g Contractors Ass'n*, 122

F.3d at 927 (11th Cir. 1997).

The question of narrow tailoring presents disputes as to material factual

allegations. The Alliance acknowledges that there is a dispute about whether there

is an end date for the Racial Minorities Requirement: the Alliance alleges in its

Complaint that there is no end date, and the Association denied that allegation in

its Answer. *Compare* Compl. ¶ 33, Doc. 1 (including among its allegations the

assertion that the Racial Minorities Requirement "has no end date") *with*

Intervenor Def's Answer ¶ 33, Doc. 55.[8] Alabama law necessarily imposes an end

date on the Board and its requirements through the State's Sunset Law. Ala. Code

§ 34-27A-28 (noting that the Board is subject to review under the Sunset Law);

Ala. Code §§ 41-20-1-16 (Alabama Sunset Law). As a result of that requirement,

the Legislature must decide at regular intervals whether to reauthorize the Board as

---

[8] The Alliance asserts that whether there is a logical end point for the Racial
Minorities Requirement is "critical" to the narrow tailoring inquiry. Mot. 8.

it stands, modify it, or even eliminate it entirely. Ala. Code § 41-20-5; *see also*

Ala. Code § 41-20-7 (listing nine factors that the Legislature shall consider,

including at public hearings, when deciding on reauthorization). And the Alliance

now concedes this fact. *See* Mot. 2 n. 2 (noting that the Legislature regularly

reauthorizes the Board, most recently through October 2028). Nonetheless, the

Alliance glosses over the Alabama Code and the dispute on the face of the

pleadings, asserting instead that "the lack of an end date is obvious from the face

of the statute and regulation." *See* Mot. 8 n. 3. This is not so, and this internally

contradictory position cannot support a judgment on the pleadings. The

Association should not be foreclosed from discovering and producing this and

other evidence to support its position.

The Alliance then raises several new factual assertions related to narrow

tailoring that were never alleged in its Complaint. The Alliance now asserts that

"there is no indication that Alabama considered any race-neutral alternatives"

before adopting the Racial Minorities Requirement. Mot. 7. But the Alliance relies

on its own say-so rather than citing *any* facts, undisputed or otherwise, from the

pleadings. Likewise, the Alliance claims that there is "no evidence of past

discrimination" against other appointees of a minority race (*e.g.*, Chinese,

Brazilian, Native American) to justify their inclusion in the Racial Minorities

Requirement. *Id.* But that too is an open factual question that was never addressed

in the pleadings, nor do the pleadings address what groups the Legislature intended to include in its definition of members of "a minority race."

## III. The Alliance's Incorrect Reading of Equal Protection Precedent Should Be Rejected.

Contrary to the cherry-picked language in *SFFA* and *Croson* that the Alliance relies upon to support its legal argument, both cases, decided in vastly different contexts than those at issue here,[9] further illustrate why the Alliance's Motion should be denied.

Initially, the Alliance mischaracterizes the Supreme Court's discussion of its Equal Protection precedent in *SFFA*, and what constitutes a compelling

---

[9] The Court in *SFFA* focused its discussion and holding on cases and precedent about university admissions decisions. *See, e.g.*, *SFFA*, 600 U.S. at 208 ("These cases involve whether a university may make admissions decisions that turn on an applicant's race."); *id.* at 230 ("[T]he Harvard and UNC admissions programs cannot be reconciled with the guarantees of the Equal Protection Clause. . . . We have never permitted admissions programs to [impose racial classifications in the way Harvard and UNC did], and we will not do so today."); *see also generally id.* at 208-213 (discussing the applicability of the Court's admissions precedents); *id.* at 214-225 (distinguishing between interests at play in classifications based on race that can withstand strict scrutiny and those at issue in Harvard and UNC's admissions policies). Similarly, the Court in *Croson* focused on the applicability of equal protection law in local public contracting, specifically distinguishing it from other contexts and *preserving* the right of state and local authorities to take remedial action. *See, e.g.*, *Croson*, 488 U.S. at 509 ("Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction."); *id.* at 504 (distinguishing between how equal protection precedent might apply to local authorities awarding contracts and federal authorities, based on a congressional exercise of authority, awarding contracts).

governmental interest. The Alliance suggests that the Supreme Court has provided a comprehensive, and exclusive, list of interests that are sufficiently compelling to withstand strict scrutiny. *See* Mot. 5 ("Under current Supreme Court precedent, there are only two recognized interests that can be sufficiently compelling to allow the government to treat individuals differently based on race.") (citing *SFFA*, 600 U.S. at 207). But the Court announced no such rule in *SFFA*, *Croson*, or elsewhere. Instead, the Court in *SFFA* acknowledged those compelling interests that it has recognized, while expressly leaving open the possibility that additional governmental interests may be sufficient to withstand strict scrutiny. *See SFFA*, 600 U.S. at 207 ("Outside the circumstances of [college admissions] cases, our precedents have identified only two compelling interests that permit resort to race-based government action."); *id.* at 213 n.4 ("The United States as amicus curiae contends that race-based admissions programs further compelling interests at our Nation's military academies. . . .  This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present.").

Even in the context of those recognized compelling interests, the Alliance imagines limitations that simply do not exist. For instance, after citing the "remediating past discrimination" language in *SFFA*, but without any other explanation, the Alliance contends that the only evidence that is relevant to determine whether a governmental classification based on race was designed to

"remediat[e] specific, identified instances of past discrimination that violated the Constitution or a statute" under *SFFA* is the text of the public law at issue. *See* Mot. 5-6 (citing only the legislative text and federal law as support for its argument that "there is no history of racial discrimination in AREAB appointments that the [Racial Minorities Requirement] could have been intended to remedy. . . . And rather than having anything to do with remedying past racial discrimination," the Board was created to comply with federal law). But the Supreme Court has imposed no such requirement.

The Alliance's attempt to shoehorn *Croson*'s language about general societal discrimination into the facts at issue here suffers similar defects. Plucking one sentence from a 35-page majority opinion, the Alliance argues that the Association's claim must fail because "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." Mot. 6 (citing *Croson*, 488 U.S. at 498).[10] This argument mischaracterizes *Croson*. There, the Court found that the City of Richmond attempted to remedy the effects of past

_____

[10] The Alliance cannot rely on the Association's statement of its legal interests as an intervenor, outlined in the Motion to Intervene, as the statement of the compelling state interest. *Horsley*, 292 F.3d at 700 (noting that, on a motion for judgment on the pleadings, only the pleadings and any judicially noticed facts are relevant); *see also Perez*, 774 F.3d at 1336 (explaining that for 12(c) purposes, the pleadings include complaints, third-party complaints, answers, and any court-ordered reply to an answer).

21

and present discrimination in the construction industry writ large by creating a

program to set aside a percentage of a certain type of construction contracts for

minority business owners. *Id.* at 498. With two exceptions, the evidence that

Richmond relied upon in creating its minority contracting program according to the

Court related to a history of discrimination in the construction industry nationwide,

not in the City of Richmond or even the State of Virginia, and not specific to

government contracts. *Id.* at 499. While evidence of "very few minority contractors

in local and state contractors' associations" related to the City and State, *id.*, it was

an imprecise standard that did not alone demonstrate discrimination by anyone in

the Richmond construction industry. *Id.* Likewise, the disparity between the

number of minority businesses that receive the relevant type of city contracts and

the general population did not provide the requisite evidence because it compared

the wrong datasets. *See id.* at 500-502 ("[W]here special qualifications are

necessary, the relevant statistical pool for purposes of demonstrating

discriminatory exclusion must be the number of minorities qualified to undertake

the particular task."). The fact that the factual presentation in *Croson*, a distinct set

of evidence pulling from different data sets in an unrelated context, was found to

be too "generalized" is far from dispositive here and does not preclude the

Association from developing a record of past and present discrimination that would

be sufficiently specific.

22

In sum, *SFFA*, *Croson*, and the other cases that the Alliance relies on in support of its unfounded Motion were all decided on well-developed factual records and do not foreclose the need for one here.

## CONCLUSION

The Court should deny the Alliance's Motion for Judgment on the Pleadings as the pleadings present disputed allegations of material fact.

June 10, 2024                                    Respectfully submitted,

                                                */s/ Brooke Menschel*
                                                Brooke Menschel
                                                Ala. Bar No. ASB-7675-Z61K
                                                Aleshadye Getachew**
                                                D.C. Bar No. 1007161
                                                Victoria Nugent*
                                                D.C. Bar No. 470800
                                                Sunu Chandy*
                                                D.C. Bar No. 1026045
                                                Democracy Forward Foundation
                                                P.O. Box 34553
                                                Washington, DC 20043
                                                (202) 448-9090 Ext. 1011
                                                bmenschel@democracyforward.org
                                                agetachew@democracyforward.org
                                                vnugent@democracyforward.org
                                                schandy@democracyforward.org
                                                *Admitted Pro Hac Vice*
                                                **Pro Hac Vice Pending*

                                                Martin E. Weinberg
                                                Ala. Bar No. ASB-0817-A61W
                                                Law Firm of Martin E. Weinberg

P.O. Box 154
Shannon, Alabama 35142
(205)785-5575
attorneyweinberg@bellsouth.net

*Counsel for Intervenor Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court via CM/ECF which will send notification to all counsel of record.


*/s/ Brooke Menschel*
Brooke Menschel
*Counsel for Intervenor Defendant*