## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

|  |  |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, a nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama,<br><br>Defendant,<br><br>ALABAMA ASSOCIATION OF REAL ESTATE BROKERS, a nonprofit corporation,<br><br>Intervenor-Defendant. | Civil Action No. 2:24-cv-00104-RAH-JTA<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

This case presents a straightforward claim that the racial quota in Ala. Code § 34-27A-4 and Ala. Admin. Code 780-X-1-.02 is unconstitutional. Alabama's Governor—who is responsible for implementing the quota—concedes that it cannot survive strict scrutiny. Intervenor disagrees, arguing that the racial requirement is consistent with the Equal Protection Clause. But Intervenor fails to even raise a dispute of material fact, either as to the Alliance's standing or as to either prong of strict scrutiny. This Court's prior conclusion that the Alliance has standing is binding on Intervenor. And Intervenor has not suggested any facts that would create a genuine dispute as to the constitutionality of the racial quota. Although granting judgment on the pleadings to a plaintiff is unusual, it is likewise unusual that a statute is so obviously unconstitutional that the government official responsible for implementing it agrees that it violates the Equal Protection Clause. This is one of the rare cases in which judgment on the pleadings is merited.

## ARGUMENT

### I.    The Alliance has standing to pursue its equal protection claim

The Court has already resolved the issue of the Alliance's standing. In its Order denying the Alliance's Motion for Preliminary Injunction/TRO, it held that the Alliance "had standing to pursue its equal protection claim at the initiation of the lawsuit, it has standing now, and it will have standing if [the Governor's appointments are] confirmed." Doc. 30 at 9; *see also id.* at 11 ("[The Alliance] does have standing and will continue to have it even if all nine appointees are confirmed."). That decision was based not only on the allegations of the Complaint, but on factual declarations filed by the President of the Alliance and by Member A (who the Alliance later identified as Laura Clark). *See* Doc. 11-5 (declaration of Edward Blum); 11-6 (declaration of Member A). Those declarations establish that Ms. Clark: is a member of the Alliance; is ready and able to be appointed to AREAB; submitted an application to be appointed to the public member position on AREAB; is not a racial minority; and meets all nonracial requirements for AREAB eligibility. *See* Doc. 11-5 ¶¶ 3–5; Doc. 11-6 ¶¶ 2–7.

Neither the Governor nor Intervenor suggests that any of these facts have changed since the Court held that the Alliance has standing. That holding is thus the law of the case.[1] *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) ("[A]n issue decided at one stage of a case is binding at later stages of the same case" unless "(1) new and substantially different evidence emerges …; (2) controlling authority has been rendered that is contrary to the

---

[1] The law of the case doctrine applies not only where there has been a final decision on the merits, but also where a new party seeks to relitigate a decided issue. *See Klay v. All Defendants*, 389 F.3d 1191, 1199 (11th Cir. 2004) ("While not an inexorable command, the law of the case doctrine provides stability and finality in litigation, which are crucial cornerstone values for developing a just and efficient judicial process." (quoting *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987))).

previous decision; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice if implemented.") (quotation omitted). None of the three exceptions to the law of the case doctrine applies here, so the Court's previous ruling stands. *See State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311, 1314 (11th Cir. 2014) (declining to revisit standing decision where party challenging standing "has not explained which, if any, of the exceptions to the law of the case apply").

Intervenor is of course correct that standing can be raised at any time in the proceedings and that the Court must assure itself of its jurisdiction. *See* Doc. 66 at 9. But the standing issue has *already* been raised, litigated, and decided; and the Court has *already* concluded that it has jurisdiction. Once litigated, the same standing issue cannot be relitigated, even by an intervenor. *See Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1359 (M.D. Fla. 2009) (citing precedent from the former Fifth Circuit "that applies issue preclusion to a standing issue, even where there is not a decision 'on the merits' of the case as a whole"); *see also Arizona v. California*, 460 U.S. 605, 615 (1983) ("[P]ermission to intervene does not carry with it the right to relitigate matters already determined in the case …."). Instead, when an intervenor joins a case, it "must accept the proceedings as [it] find[s] them" and has "no right to relitigate the issues." *In re Fontainebleau Las Vegas Holdings, LLC*, No. 09-23683-CIV, 2010 WL 11721026, at *3 (S.D. Fla. July 27, 2010) (quoting *Petition of Geisser v. United States*, 554 F.2d 698, 705 n.6 (5th Cir. 1977)). That includes the Court's determination that the Alliance has standing.

Intervenor argues that *In re Fontainebleau* is distinguishable because that case involved a decision on the merits, whereas there has been no merits decision here. Doc. 66 at 10. But that procedural difference was not essential to the court's holding regarding the rights of intervenors. Moreover, Eleventh Circuit precedent confirms the principle that intervenors may not relitigate

issues decided prior to intervention. *See Sierra Club v. Espy*, 18 F.3d 1202, 1206 n.3 (5th Cir. 1994) ("The intervenor has no right to relitigate issues already decided."); *Meek v. Metro. Dade Cnty.*, 985 F.2d 1471, 1483 (11th Cir. 1993) (citing *Geisser*, 554 F.2d at 705 n.6, and holding that "intervenors occupy the position of [the initial party]" and are bound by steps taken earlier in the litigation), *abrogated on other grounds*, *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007).

Even if Intervenor were able to relitigate standing, the Court's prior ruling is correct. When a government-imposed barrier makes it "more difficult for members of one group to obtain a benefit than it is for members of another group," the "denial of equal treatment resulting from the imposition of the barrier" constitutes an injury in fact. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). As the Eleventh Circuit recently held in *AAER v. Fearless Fund*, a plaintiff who can show she is "able and ready" to apply for the benefit "has demonstrated a concrete injury." 103 F.4th 765, 772 (11th Cir. 2024). The court emphasized that being denied an opportunity to compete due to one's race is a serious and redressable injury: "We're talking about real-live, flesh-and-blood individuals who were excluded from the opportunity to compete [] solely on account of the color of their skin." *Id.* at 774. And it is undisputed that Ms. Clark submitted an application for a position on AREAB, which goes beyond what *Fearless Fund* held is needed for standing to challenge race-based criteria. *Id.* (submitting an application that will be denied based on race is unnecessary to establish standing, as "Article III doesn't require so futile a gesture").

Intervenor argues that the Alliance can only have standing if it has "at least one member who would be eligible for each seat [on AREAB]." Doc. 66 at 8–9. This Court already rejected that argument in ruling that the Alliance would have standing even if all vacancies on AREAB

were filled. Doc. 30 at 9, 11.[2] The argument is also legally unsupportable. The statute's racial-minorities requirement applies to the Board as a whole, not to specific seats. And because an association's standing derives from the standing of its members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), Intervenor's position would mean that injured individuals are unable to challenge AREAB's racial requirement on their own—it could only be challenged by *groups* of plaintiffs who collectively are eligible for every seat on the Board. That position has no support in law and is contrary to common sense. Intervenor cites *United States v. Hays*, 515 U.S. 737 (1995), but that case involved plaintiffs who were wholly unaffected by the allegedly unconstitutional action. The plaintiffs complained of gerrymandering in a district they did not live or vote in and had "not otherwise demonstrated that they, personally, ha[d] been subjected to a racial classification." *Id.* at 739. Here, the opposite is true. Ms. Clark faces direct racial discrimination as to a government board for which she is otherwise qualified and has, in fact, applied for. She—and thus the Alliance—is directly affected by the unconstitutional statute because she has been denied a chance to compete fairly for a position on AREAB.

Nor are there any disputed facts about standing that require discovery. The nonracial requirements for the public member position on AREAB are minimal: a candidate must be a citizen of Alabama, must not have already served two consecutive terms on the board, and must not be engaged in the practice of real estate appraising or married to someone who is.[3] There is no dispute that Ms. Clark satisfies those requirements. Intervenor claims to want discovery into whether

---

[2] The Governor had made the same argument as Intervenor, contending that because the Alliance did not show "that any of its members are even eligible for appointment to those eight [non-public-member] positions, it lacks standing to seek relief regarding them." Doc. 20 at 9.

[3] *See* Ala. Code § 34-27A-4 ("Each member of the board, except for the representative of the appraisal management company, shall be a citizen of this state…. No person shall serve as a member of the board for more than two consecutive terms…. The public members of the board and spouses of the members shall not be engaged in the practice of real property appraising.").

Ms. Clark "is ready and able to serve as the public member of the AREAB," Doc. 57 at 4, but her readiness and ability to serve were already established at the PI stage. *See* Doc. 30 at 6–9; Doc. 11-6 ¶ 4. Perhaps Intervenor speculates that it may get her to recant her prior sworn statement, but such unfounded speculation does not create a genuine dispute of fact. Thus, even setting aside the Court's prior determination of standing, Intervenor has not identified any plausible reason why discovery is required into Ms. Clark's—and thus the Alliance's—standing.

Finally, Intervenor argues that there is a disputed issue of fact as to whether the Alliance or any of its members have been injured, since the Governor has asserted that she will not enforce the statute's racial quota.[4] But that does not follow. The Alabama legislature directed the Governor to consider race in making appointments to AREAB, and that directive has not been repealed or become moribund. *Cf. Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) (finding standing for a pre-enforcement challenge because "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund") (citations omitted). This is not an academic dispute regarding a long-abandoned provision, but a challenge to an active limitation on AREAB appointments that, unless enjoined, will apply not only to this Governor, but to every future Alabama Governor. Notably, there was no indication prior to this lawsuit that the Governor considered the racial quota unenforceable.[5] But even taking that assertion at face value, voluntary cessation of unconstitutional activity is not sufficient to

---

[4] The Governor's response repeats this assertion to "preserve[] her jurisdictional arguments." Doc. 62 at 1 n.2.

[5] In response to the PI motion, the Governor argued that she was not "forced to consider the race of the appointee to the public member spot" because she had already appointed two racial minorities to AREAB. Doc. 20 at 10. That at least implies that she otherwise *would* have been "forced" to consider race—as required by the statute's plain text. *See also id.* at 11–12 (arguing that "*if* two minority members already hold seats on the Board at the time Defendant makes the appointment, Member A or other AAER members would get the same consideration that minority candidates get," implying that otherwise they would not) (emphasis added).

deprive the Alliance of standing or to moot the case. *See United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) ("[V]oluntary cessation of allegedly illegal conduct does not moot a case …."). Likewise, federal courts will not "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). It would create an untenable Catch-22 if the government's concession in response to a lawsuit that a plaintiff is correct on the merits deprived the court of jurisdiction to hear the case.

There is also a conspicuous irony in *Intervenor* using the Governor's assertion of nonenforcement to challenge the Alliance's standing, because the whole thrust of Intervenor's involvement in this case is its assertion that the Governor must follow the statute and enforce its racial requirement. *See* Doc. 40-1 at 9 (Intervenor "believes that the [statute's racial] requirements are lawful and enforceable"); *id.* at 14 (stating Intervenor's intention to "vigorously defend" the statute's racial quota). Intervenor cannot have it both ways: on the one hand, arguing that the Governor *must enforce* the racial requirement; while on the other hand, relying on the Governor's claim that the racial requirement is *unenforceable* to argue that the Alliance lacks standing. In any event, Intervenor's "vigorous defense" of the statute, *id.*, makes clear that there is a "case or controversy" as to the constitutionality and enforceability of AREAB's racial requirement, *see* U.S. Const. art. III, § 2. As this Court already held, the Alliance has standing and there is subject-matter jurisdiction to hear this challenge.

## II.    There is no dispute of material fact on the merits

All parties agree that the challenged racial requirement is subject to strict scrutiny. *See* Doc. 62 at 2; Doc. 66 at 2. As the Governor concedes, it cannot survive such scrutiny. Doc. 62 at 2. Nor are there any disputed issues of material fact on the merits requiring discovery.

Before addressing the two prongs of strict scrutiny, there is no merit to Intervenor's argument that a challenge to racial classifications necessitates development of a factual record and

can never be decided on the pleadings. Doc. 66 at 11–14. To be sure, many of the leading race-discrimination cases were resolved after discovery, or even trial. *See id.* (citing cases). But none of them purported to establish a rule that a racial classification must be subject to discovery and fact finding before the court can determine whether it survives constitutional scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967) (finding Virginia's ban on interracial marriages to be facially unconstitutional without the need for discovery or trial). Intervenor's cited cases addressed inherently fact-bound issues like employment discrimination, university admissions policies, and racial or gender preferences for government contracts.[6] In contrast, this case is a straightforward facial challenge that can be decided based on the text of the statute, the statutory history, and the pleadings. Discovery and factual development are unnecessary where, as here, the constitutional violation is clear without them.

### A.  There is no dispute of material fact as to compelling interest

Turning to the first prong of strict scrutiny, the history of the challenged statute shows that AREAB was created not to remedy discrimination, but in response to Congress's non-racial call for states to establish licensing agencies to assure that appraisals in federally related real estate transactions would be conducted by certified and licensed appraisers. *See* Pub. L. No. 101-73, § 1117, 103 Stat. 515 (1989), *codified at* 12 U.S.C. § 3346; *see also Real Estate Appraisers Act*, 1990 Alabama Laws Act 90-639, § 31 (stating that it is the "intent of the [Alabama] legislature …

---

[6] *See Thornquest v. King*, 82 F.3d 1001 (11th Cir. 1996) (employment retaliation for free speech); *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895 (11th Cir. 1997) (race- and sex-based preferences in awarding construction projects); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*") (university admissions policy); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (race-based contracting preferences); *Virdi v. DeKalb Cnty. Sch. Dist.*, 135 F. App'x 262 (11th Cir. 2005) (discrimination in awarding architectural contracts); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234 (11th Cir. 2001) (university admissions); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) (employment discrimination).

that this act fully comply with the provisions of [FFIRREA]"); *id.* (legislative heading describing the bill as "An Act … providing generally for the conformation of state law with the requirements of [FFIRREA] …."); Frank A. Vickory, *Regulating Real Estate Appraisers: The Role of Fraudulent and Incompetent Real Estate Appraisals in the S&L Crisis and the FIRREA Solution*, 19 Real Est. L.J. 3, 13–14 (1990) ("[T]he profession of real estate appraisal has been, until very recently, largely unregulated at the state level…. Thus, in order to assure availability of state certified or licensed appraisers to perform appraisals in connection with federally related transactions, FIRREA authorizes each state to establish a state agency to regulate the profession."). Intervenor does not dispute this provenance. Intervenor also does not claim that the need to assure licensed appraisers in federally related transactions is a compelling interest that supports Alabama's racial requirement.

Nor is a racial quota justified by a remedial purpose. It is undisputed that the racial quota was part of AREAB from its creation. Thus, the Alabama legislature's goal in adding a racial requirement when responding to Congress's call for appraiser regulation cannot have been to remedy racial discrimination in AREAB appointments. Intervenor speculates that in later years, Governors might have "chose[n] not to enforce the statute" and racially discriminated in AREAB appointments. Doc. 66 at 14–15. Of course, declining to follow the racial quota would not alone constitute racial discrimination, since the quota itself is discriminatory. But even hypothesizing some other type of racial discrimination in AREAB appointments, that cannot reach back in time to provide a compelling interest that would justify the adoption of a racial quota from the outset.

Intervenor's attempt to lift AREAB's racial requirement by its own bootstraps is both implausible and legally insufficient.[7]

Intervenor also speculates that the legislature's decision to include a racial requirement "may have [been] impacted" by "racial discrimination against appraisers and in appraisals." Doc. 66 at 14. But Intervenor does not cite any authority holding that racial discrimination in an industry can justify a racial quota for a board that regulates that industry. To the contrary, the assertion that a regulatory board must have a set number of racial minorities in order to remedy racial discrimination in the industry relies on "stereotypes that treat individuals as the product of their race," which is contrary to the "core purpose" of the Equal Protection Clause. *SFFA*, 600 U.S. at 221 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)). Even assuming there has been rampant and pervasive racial discrimination "against appraisers and in appraisals" in Alabama, that would not create a compelling interest supporting racial criteria for who gets appointed to AREAB.

Additionally, "a generalized assertion that there has been past discrimination in an entire industry" cannot satisfy the compelling interest prong because it "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy" and "'has no logical stopping point.'" *Croson*, 488 U.S. at 498 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 275 (1986)); *see also SFFA*, 600 U.S. at 226. Although *Croson* concluded that there may be a remedial compelling interest where the government has "essentially become a 'passive participant' in a system of racial exclusion," 488 U.S. at 491–92, the Supreme Court in *SFFA* was

---

[7] Intervenor cites *Engineering Contractors* for the proposition that it can rely on "data related to years after a racial classification was implemented" to support a compelling interest. Doc. 66 at 15 n.7 (citing 122 F.3d at 911). But the argument in *Engineering Contractors* was that later statistical evidence could help show a history of discrimination in contracting awards. *See* 122 F.3d at 926 (asking whether the County "ha[d] a sufficient evidentiary foundation for enacting [affirmative action] programs *in the first place*") (emphasis added). Here, a history of discrimination in AREAB appointments is literally impossible because AREAB did not exist prior to the racial requirement.

clear that there is no such compelling interest unless there are "specific, identified instances of past discrimination *that violated the Constitution or a statute*." *SFFA*, 600 U.S. at 207 (emphasis added). Intervenor does not suggest or identify any constitutional or statutory provision that might have been violated by past discrimination in Alabama's appraisal industry. And to the extent racial discrimination in appraisals is "societal" as opposed to discrimination in which the government actively or passively participates, that does not create a compelling interest. *SFFA*, 600 U.S. at 226; *Ensley*, 31 F.3d at 1552, 1565; *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest.").

Intervenor insists that discovery may help it "develop[] a record of past and present discrimination that would be sufficiently specific" to satisfy the compelling interest prong. Doc. 66 at 22. Intervenor accordingly proposed in the Rule 26(f) report that it be broadly allowed discovery into "the history of racial and other discrimination in board appointments, licensure, regulation, housing, lending, appraising, and other activities that affect real estate values and home ownership in Alabama," Doc. 57 at 5. But as explained above, even a clear history of racial discrimination (let alone "other" discrimination) in Intervenor's laundry list of industries and activities would not justify the racial quota in AREAB appointments. "District courts need not condone the use of discovery to engage in 'fishing expedition[s].'" *Liles v. Stuart Weitzman, LLC*, No. 09-61448-CIV, 2010 WL 1839229, at *5 (S.D. Fla. May 6, 2010) (quoting *Rivera v. Nibco, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004)) (disapproving discovery "on the off-chance that it may find some evidence of wrongdoing"). Discovery is unnecessary here because Intervenor has failed to identify any facts which, if proven true, would permit the statute's racial discrimination.

Finally, Intervenor argues that the Alliance misreads *SFFA* and *Croson* and implies that there may be some other compelling interest—separate from remedying discrimination—that

could justify AREAB's racial requirement. Doc. 66 at 20 (arguing that *SFFA* "le[ft] open the possibility that additional governmental interests may be sufficient to withstand strict scrutiny"). This argument is entirely theoretical, however, as Intervenor does not suggest any specific interest as sufficiently compelling to justify the racial quota here. *See* Doc. 66 at 19–20. Moreover, a plain reading of recent Supreme Court precedent shows that the Alliance correctly described the strict limits on the governmental interests that can potentially justify racial discrimination. *See SFFA*, 600 U.S. at 207 ("Outside the circumstances of [college admissions] cases, our precedents have identified only two compelling interests that permit resort to race-based government action."). And although Intervenor is obviously correct that the facts of *SFFA* and *Croson* are not identical to those here, *see* Doc. 66 at 19 n.9, those cases provide guidance for applying strict scrutiny in the context of racial discrimination generally. *See, e.g.*, *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 770 n.8 (E.D. Tenn. 2023) ("The facts in [*SFFA*] concerned college admissions programs, but its reasoning is not limited to just those programs."); *Vitolo v. Guzman*, 999 F.3d 353, 357, 361 (6th Cir. 2021) (applying *Croson* to racial discrimination in COVID relief for restaurants); *Wynn v. Vilsack*, 545 F. Supp. 1271, 1277 (M.D. Fla. 2021) (applying *Croson* to racial discrimination in federal debt relief to farmers). Intervenor has failed to satisfy or even raise a dispute of material fact as to the compelling interest prong.

## B.    There is no dispute of material fact as to narrow tailoring

"The essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences ... must be only a 'last resort' option." *Eng'g Contractors*, 122 F.3d at 926 (quoting *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993)). Even if Intervenor had established a factual dispute as to whether Alabama had a compelling interest in establishing a racial quota for AREAB, its argument fails on the narrow tailoring prong. This

deficit independently renders the statute unconstitutional and entitles the Alliance to judgment on the pleadings.

First, Intervenor does not dispute that the statute has a rigid quota. No matter what, Alabama law requires that there must always be at least two racial minorities on AREAB. Ala. Code § 34-27A-4; Ala. Admin. Code 780-X-1-.02; *see also Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1282 (M.D. Fla. 2021) (concluding that a "rigid, categorical, race-based qualification … is the antithesis of flexibility"). That lack of flexibility means that the law fails the narrow tailoring inquiry.

Second, the statute encompasses all racial minority groups, regardless of whether there have been "specific, identified instances of past discrimination [against those groups] that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207. Intervenor implies that there may be an open question as to "what groups the Legislature intended to include in its definition of members of 'a minority race,'" Doc. 66 at 19, but that lack of specificity only makes the statute murkier and, if anything, *less* narrowly tailored to remedying past discrimination. Intervenor also provides no explanation as to how the statutory requirement could be interpreted more narrowly than its plain text and cites nothing showing the statute is tailored to instances of actual discrimination. To the extent Intervenor argues that the inclusion of *every* racial minority group is narrowly tailored because there may be relevant evidence of specific, intentional governmental racial discrimination against *all* racial minority groups in Alabama, Doc. 66 at 18, that suggestion is speculative to the point of implausibility.

Third, Intervenor takes issue with the Alliance's assertion that "there is no indication that Alabama considered any race-neutral alternatives" for achieving a compelling interest, Doc. 66 at 18, but points to nothing in the statute or its history showing such consideration. Nor are any of

Intervenor's proposed discovery topics geared toward uncovering evidence that the legislature considered race-neutral alternatives before mandating a racial quota. *See* Doc. 57 at 4–5. Even assuming for purposes of argument that the legislature sufficiently considered and rejected race-neutral alternatives, that would not be enough to counteract the statute's severe lack of narrow tailoring.

Finally, Intervenor cannot reasonably dispute that the statute's racial quota lacks any logical endpoint—that is plain on its face. Intervenor apparently believes that because it responded "denied" to Plaintiff's allegation that the statute lacks an end date, there is a genuine dispute of material fact precluding judgment under Rule 12(c). *See* Doc. 66 at 17 (citing Doc. 1 at 6 ¶ 33; Doc. 55 at 5 ¶ 33).[8] Not so. Courts resolve Rule 12(c) motions under the same plausibility standard that guides 12(b)(6) motions. *See Samara v. Taylor*, 38 F.4th 141, 152 (11th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Thus, bare legal conclusions—including when phrased as a denial—merit no deference. *Id.*; *cf. Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (2014) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). Defendant's cursory and unsubstantiated denial of what is plain on the face of the statute does not create a genuine dispute of material fact.

In a last-ditch effort to salvage AREAB's racial quota, Intervenor argues that as a matter of law, Alabama's Sunset Law "necessarily imposes an end date" that satisfies the narrow tailoring inquiry. Doc. 66 at 17. The Sunset Law directs the legislature to review state agencies every four years to determine whether the agencies should continue or be terminated. *See* Ala. Code § 41-20-1 to -16. Contrary to Intervenor's argument, quadrennial review of whether to keep a regulatory

---

[8] Of course, the *Proposed* Answer that Intervenor submitted when asking the Court to allow it to intervene admitted the obvious—that the statute and regulation have no end date. Doc. 40-3 at 4 ¶ 33.

agency—especially one that was requested by Congress—is not a sufficient substitute for the constitutional requirement that a racial quota "at some point … must end." *SFFA*, 600 U.S. at 213. If simply being subject to the Sunset Law were enough to satisfy the narrow tailoring inquiry, statutes governing many Alabama agencies would automatically be narrowly tailored. *See* Ala. Code § 41-20-3 (listing agencies subject to automatic Sunset review). The Alliance does not dispute that the Alabama legislature could amend the challenged statute to eliminate AREAB's racial quota, but that would be true even if AREAB were not subject to the Sunset Law. The mere possibility of legislative repeal does not satisfy the requirement that racial classifications may not continue indefinitely. AREAB's racial quota is not narrowly tailored and cannot survive strict scrutiny.

## CONCLUSION

As Intervenor's response notes, in granting intervention the Court stated that Intervenor "has shown it must be heard." Doc. 66 at 1 (quoting Doc. 54 at 6). Intervenor has now been heard, and its arguments fail. There are no genuine disputes of material fact requiring discovery, and the Alliance is entitled to judgment as a matter of law. The Court should therefore grant the Alliance's motion for judgment on the pleadings under Rule 12(c).

DATED: June 26, 2024.

Respectfully submitted,

/s/ Glenn E. Roper
GLENN E. ROPER*
Colo. Bar No. 38723
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 503-9045
GERoper@pacificlegal.org

JOSHUA P. THOMPSON*
Cal. Bar No. 250955
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
JThompson@pacificlegal.org

*Pro Hac Vice*

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2024, I electronically filed a copy of the foregoing with

the Clerk of the Court via CM/ECF which will send notification to all counsel of record.

/s/ Glenn E. Roper
GLENN E. ROPER
*Attorney for Plaintiff*